TELEDYNE, INC., Teledyne Industries, Inc., Teledyne Electronic Systems, Inc., and Allegheny Teledyne, Inc., Plaintiffs,

v.

The UNITED STATES, Defendant.

Nos. 96–782C, 97–792C, 97–659C.

United States Court of Federal Claims.

Aug. 9, 2001.

Harvey G. Sherzer, Washington, DC, for plaintiffs. Scott Arnold and Karen L. Manos, of counsel.

C. Coleman Bird, Washington, DC, with whom were Acting Assistant Attorney General Stuart E. Schiffer, and Director David M. Cohen, for defendant. Lawrence S. Rabyne, Defense Contract Management Command, of counsel.

Melvin Rishe, Washington, DC, for Amicus Curiae General Electric Company. Francis J. O'Toole, Howard Stanislawski, Mark P.

Guerrera, Jonathan A. DeMella, and Barckett B. Denniston, III, of counsel.

John Lloyd Rice, Washington, DC, for Amicus Curiae General Motors Corporation. Anthony J. Trenga and Norman R. Thorpe, of counsel.

## OPINION

FIRESTONE, Judge.

## I. INTRODUCTION

This matter is before the court on the parties' cross motions for partial summary judgment. In this action, Allegheny Teledyne Inc., Teledyne, Inc., Teledyne Industries, Inc., and Teledyne Electronic Systems, Inc. (collectively "Teledyne")[1] challenge the government's claim for more than $100 million in connection with Teledyne's sale of two divisions in 1995 and 1996.[2] The government claims that payment is compelled by Cost Accounting Standard ("CAS") 413.50(c)(12), which governs the accounting of pension costs in the event of a "segment closing." The government contends that the sale of each of the divisions constitutes a "segment closing" under the original and amended CAS 413.50(c)(12). *See* 4 C.F.R. § 413.50(c)(12) (1986); 48 C.F.R. 9904.413–50(c)(12) (1995). The government argues that under CAS 413.50(c)(12), Teledyne owes the government a share of the surplus pension assets that Teledyne retained following the sales.[3] Teledyne disputes the government's claim, and argues that under a correct interpretation of the original and amended CAS 413.50(c)(12) the government is not entitled to any share of the pension plan surplus.

General Electric Company and General Motors Corporation filed similar actions in connection with the sales of divisions within

their companies. *See General Electric Co. v. United States,* No. 99–172C (Fed. Cl. filed Mar. 26, 1999); *General Motors Corp. v. United States,* No. 00–40C (Fed. Cl. filed Jan. 27, 2000). General Electric Company ("GE") and General Motors Corporation ("GM") have filed motions for partial summary judgment in each of their own cases, regarding the issues raised in the present action. GE and GM have also participated in this action as amici curiae. Similarly, Teledyne has participated as an amicus curiae in GE's and GM's cases.

For the reasons set forth below, the court grants in part and denies in part the government's motion for partial summary judgment. The court also grants in part and denies in part plaintiffs' motion for partial summary judgment. The court is issuing separate rulings in the *GE* and *GM* cases based on the decision in the present case.

## II. BACKGROUND FACTS

### A. The TES Sale

On January 2, 1995, Teledyne sold the assets of Teledyne Electronic Systems ("TES") to Litton Industries, Inc. and Litton Systems, Inc. (collectively "Litton"). Pursuant to the terms of the TES Sales Agreement, Teledyne transferred TES's government contracts, with government approval, to Litton. Also pursuant to the terms of the TES Sales Agreement, Teledyne retained all of the pension plan assets and liabilities attributable to TES. The TES pension plans became fully funded in 1987, at which time the government ceased making contributions. All of the TES pension plans' assets and liabilities were retained by Teledyne and are

---

1. Teledyne Industries, Inc. is a wholly-owned subsidiary of Teledyne, Inc. Teledyne, Inc. is in turn owned by Allegeny Teledyne Inc. ("ATI"). ATI, a Delaware corporation, was created as a result of the August 15, 1996 merger between Allegheny Ludlum Corp. and Teledyne, Inc.

2. The two divisions that Teledyne sold included Teledyne Electronic Systems and Teledyne Vehicle Systems.

3. As discussed at length, *see infra* Part V, CAS 413 establishes certain rules for the accounting of pension costs under negotiated CAS-covered

contracts. At issue in this litigation are the rules governing the accounting of costs associated with defined-benefit pension plans. A "defined-benefit pension plan" is defined under CAS 412.30(a)(10) as a "pension plan in which the benefits to be paid or the basis for determining such benefits are established in advance and the contributions are intended to provide the stated benefits." 48 C.F.R. § 9904.412–30(a)(10) (1995). Throughout this opinion, the terms "pension plans" or "pension funds" are used to refer to "defined-benefit pension plans" only.

included in Teledyne's (now ATI's) Pension Plan master trust.[4]

Following the sale of TES, Teledyne's Corporate Administrative Contracting Officer ("CO"), Henry M. Field, wrote to Teledyne in November 1995, and directed Teledyne to submit a final accounting of pension assets and liabilities as required under the original CAS 413.50(c)(12). The original CAS 413 calls for this accounting whenever there is a "segment closing." "Segment" is defined under CAS 413 to mean "one of two or more divisions, product departments, plants, or other subdivisions of an organization reporting directly to a home office." 4 C.F.R. § 413.30(a)(11) (1986). The term "closing" is not defined. In the event a contractor closes a segment, CAS 413.50(c)(12) expressly provides that the contractor must:

> determine the difference between the actuarial liability for the segment and the market value of the assets allocated to the segment .... The calculation ... shall be made as of the date of the event (e.g., contract termination) that caused the closing of the segment .... *The difference between the market value of the assets and the actuarial liability for the segment represents an adjustment of previously-determined pension costs.*

*Id.* at § 413.50(c)(12) (emphasis added).

In its letter to Teledyne, the CO stated that although the segment closing was governed by the above-noted language, the Cost Accounting Standards Board ("CASB"), responsible for promulgating new cost accounting standards, had recently amended CAS 413. *See* 48 C.F.R. § 9904.413. The CO concluded that under the amended 1995 CAS 413.50(c)(12), Teledyne would have to pay over to the government all of the surplus pension assets attributable to previous government contributions made under all of its CAS-covered contracts, including contributions made under both flexibly-priced and firm-fixed-price contracts. The CO explained that the new CAS 413 expressly defined a "segment closing" to include the sale of a division. *Id.* § 9904.413–30(a)(20) (1995). In addition, the CO noted that the new CAS 413 segment closing provision provided for both *cost* and *price* adjustments. Subparagraph (vii) of the 1995 CAS 413.50(c)(12) provides: "The full amount of the Government's share of an adjustment is allocable, without limit, as a credit or charge during the cost accounting period in which the event occurred and *contract prices/costs will be adjusted accordingly.*" *Id.* § 9904.413–50(c)(12)(vii) (emphasis added). Although the CO acknowledged that the TES sale predated the amendments to CAS 413, the CO stated that the new CAS 413.50(c)(12) provided useful guidance in construing the original CAS 413.50(c)(12) and should be followed to determine the amount owed to the government.

By letter dated December 18, 1995, Teledyne submitted the requested final accounting of pension assets and liabilities of the TES pension plans, as of the date of the sale of TES. The TES final accounting provided the following values for the TES pension assets and liabilities, measured as of December 31, 1994, and computed based on a 6% expected return:

| | | |
|---|---|---|
| i. | Fair Market Value of Pension Assets | $82.1 million |
| ii. | Liabilities | $78.8 million |
| iii. | Surplus Assets | $ 3.3 million. |

On August 21, 1996, the CO issued a final decision, asserting a government claim against Teledyne for $2,883,165 plus interest from the date of the sale of TES. The CO computed the amount of the government claim by multiplying the amount of the TES pension surplus by TES's percentage of CAS-covered contracts, including both flexibly-priced and firm-fixed-price contracts, during the period of years the CO deemed to be representative of the government's participation in the TES pension plans.[5] The CO

---

4. When Teledyne merged with Allegheny Ludlum in 1996 to form ATI, Teledyne's pension plans were substantially over funded, while Allegheny's pension plans were substantially under funded. As a result of the merger, ATI's pension plans are fully funded, and ATI is no longer contributing to those plans.

5. Under the new CAS 413 segment closing provision, the government's share of the "adjustment" is determined by first selecting a "period of years representative of the Government's participation" in funding the contractor's pension plan. *Id.* § 9904.413–50(c)(12)(vi). The adjust-

stated that his final decision was based on the original CAS 413.50(c)(12), which was incorporated into TES Contract No. N0019–88–C–0009, the contract open at the time of the segment closing. But, in fact, the CO applied the cost and price adjustment principles set forth in the 1995 amendments to CAS 413.50(c)(12), and not those included in the original CAS 413.50(c)(12).

Teledyne filed the present action on December 13, 1996, challenging the CO's August 21, 1996 final decision on numerous grounds, and in particular, with respect to the CO's reliance on the amended 1995 CAS 413.50(c)(12) as a measure of Teledyne's liability. On February 25, 1997, the government filed a counterclaim against Teledyne seeking $2,883,165 as an "adjustment of previously-determined pension costs."

After the complaint was filed, sometime in 1997, the CO requested that the Contractor Insurance/Pension Review ("CIPR") team recompute the amount of the TES pension surplus using an interest rate assumption of 8.5%, which was the average rate of return Teledyne received on pension plan assets from 1987 through 1996. Using an interest rate assumption of 8.5% instead of the 6% rate used by Teledyne, the amount of the TES pension surplus rose from $3,361,673 to $12,356,000. The CIPR team subsequently revised its interest rate computation again based on the average 9.71% rate of return Teledyne obtained on its plan from 1985 through 1994. Using an interest rate assumption of 9.71% instead of 6% increased the amount of the TES pension surplus from $3,361,673 to $15,849,000.

Based on these recalculations, by letter dated August 6, 1997, the CO issued a second "final decision of the contracting officer." The "additional final decision" asserted that the amount of the TES pension surplus is $15,849,000, and it increased the amount of the government claim to $13,486,000. The new claim was based on the CO's further finding that during the relevant period, government contracts amounted to 85.1% of the TES division's business and hence 85.1% of the surplus was attributable to government contributions to the pension plans. Teledyne appealed the CO's second final decision on September 30, 1997, and the government filed a counterclaim on December 2, 1997, in the amount of $13,486,000.[6]

## B. The TVS Sale

On March 31, 1996, following the promulgation of the 1995 amendments to CAS 413, Teledyne sold Teledyne Vehicle Systems ("TVS") to General Dynamics Land Systems, Inc. ("GDLS"). At the time of the sale, Teledyne had two firm-fixed-price contracts with the government: (1) Contract No. DAAE070–95–C–0491 for 150 crankshafts at a total contract value of $1,392,535 (dated June 2, 1995); and (2) Contract No. DAEE07–95–C–0617 for the provision of fuel kits and related items at a total contract value of $1,500,912 (dated August 3, 1995).

---

ment is calculated by applying the following fraction:

[total pension costs allocated to CAS-covered contracts during the representative period]

÷

[total of all pension costs assigned to the representative period].

*See id.* § 9904.413–50(c)(12)(vi). After applying this fraction, the full amount of the government's share of the "adjustment" is allocable, without limit, as a credit or charge during the cost accounting period in which the event occurred and contract prices/costs are adjusted accordingly. *Id.* § 9904.413–50(c)(12)(vii). The original CAS 413.50(c)(12) contains no specific provision that sets forth a formula for applying the segment closing adjustment.

**6.** Early in this litigation, on January 20, 1998, Teledyne filed a motion to dismiss the government's counterclaim based on the CO's second final decision, incorporating the recalculation of the pension surplus. In its motion, Teledyne argued that the CO's second final decision is null and void because under the *Sharman* doctrine, the CO does not have authority to issue a subsequent claim based on the same operative facts as an earlier claim currently in litigation. *Sharman Co. v. United States,* 2 F.3d 1564, 1571 (Fed.Cir. 1993). The government responded on March 10, 1998, and argued that the *Sharman* doctrine did not bar the second final decision because it involved different issues and an additional claim against Teledyne. By virtue of the court's decision here, which will require the CO to recalculate the amount of the appropriate government share of Teledyne's pension surplus, that motion is now moot.

Both contracts were subject to full CAS coverage.

Pursuant to the terms of the TVS Sales Agreement, TVS's government contracts were transferred to GDLS with the consent of the government. Also pursuant to the terms of the TVS Sales Agreement, Teledyne transferred $35,000,000 of the TVS pension assets to GDLS to cover the pension liabilities for the TVS pension participants. Teledyne retained the remaining TVS pension assets, as well as the retiree pension liabilities and retiree medical liabilities for former vested TVS employees. The TVS pension plans had become fully funded as of 1986, at which time the government ceased making contributions to the plans. As with the TES sale, the TVS pension plans' assets remain in the Teledyne–ATI Pension Plan master trust.[7]

In response to the CO's demand for a segment closing accounting, Teledyne, following the terms of the amended CAS 413.50(c)(12), transmitted to the CO a final accounting for the TVS pension surplus in November 1996. Using a 6% interest rate assumption, Teledyne identified a $115,578,000 pension plan surplus attributable to the government's historic pension contributions. By letter dated July 14, 1997, the CO rendered a final decision, asserting, pursuant to the amended CAS 413.50(c)(12), a government claim against Teledyne for $117,329,351 plus interest from the date of the sale of TVS.[8]

On November 18, 1997, Teledyne timely appealed the CO's final TVS decision to this court. In its complaint, Teledyne asserted that, (1) the new CAS 413 does not apply "retroactively" to pension surpluses arising from pension costs paid by the government under contracts that include the original CAS 413.50(c)(12), and (2) under the original CAS 413.50(c)(12), the government is not entitled to any portion of the surplus pension assets attributable to the TVS sale. On January 20, 1998, the government filed a counterclaim in the amount of $117,329,351.

## III. THE PRESENT ACTION

Following discovery the parties began briefing the threshold legal issues regarding the meaning and applicability of the original and the amended CAS 413.50(c)(12) to the TES and TVS sales. As noted, while the parties were briefing these issues, other cases were filed by GE and GM raising similar issues.[9] Because the court has considered the arguments of GE and GM in deciding the present case, the facts of those two cases are also summarized below.

GE's case involves its sale of two business segments in 1993—the GE Aerospace sale and the GE Machinery Apparatus Operation ("MAO") sale. In its complaint, GE challenges the CO's February 24, 1999 final decision that the government is entitled to a segment closing adjustments from both sales in the amount of $530.7 million plus compound interest of $419.4 million, pursuant to CAS 413.50(c)(12). GE has not only challenged the CO's decision, but also seeks payment from the government of $539.2 million as an adjustment for pension costs and post retirement medical benefit costs arising from GE's sales of the two segments.

GM filed its case in this court on January 27, 2000. GM's case arises out of its 1993 sale of its Allison Gas Turbine division. Unlike the pension plans in Teledyne and GE, which were fully funded by 1987, at the time

---

7. During late 1995 and early 1996, Teledyne and the government's Defense Contract Management Command negotiated the terms of an Advance Agreement, which was ultimately executed by Teledyne on January 24, 1996, and by the government on January 25, 1996. The Advance Agreement addressed the treatment of any pension surplus attributable to TVS in the event of a planned sale of TVS. The Advance Agreement requires Teledyne to maintain separate accounting for the TVS pension surplus, as defined in the Advance Agreement, until the United States' entitlement to a government share of the TVS pension surplus is definitively determined by mutual agreement of the parties or through litigation.

8. After the TVS final decision was issued, the Defense Contract Audit Agency ("DCAA") determined that the percentage of CAS-covered contracts used in the TVS final decision was inaccurate and should be reduced from 72.9% to 67.6%.

9. By orders dated April 6 and July 20, 2000, both the GE and the GM cases were reassigned to this court.

of the Allison segment closing the subject GM pension plans were under funded. That is, for each GM pension plan, the market value of the assets of the pension plan was significantly less than its actuarial liabilities.[10] In its complaint, GM contends that it is entitled to $311,450,592 plus interest from the government, pursuant to CAS 413.50(c)(12), either under the CAS itself or as an equitable adjustment due to a mandatory "change in accounting practice" under FAR 52.230-2(a)(4)(i).[11] The government denies GM's claims under the CAS and the FAR.

Following the conclusion of briefing on the cross motions for partial summary judgment in the present action, GE, GM, and the government filed cross motions for partial summary judgment on the proper interpretation and applicability of both the original and the amended 1995 version of CAS 413.50(c)(12) to the GM and GE segment closings. Teledyne and GE submitted amicus curiae briefs in the *GM* case, and Teledyne and GM submitted amicus curiae briefs in the *GE* case. The parties completed briefing on the motions for partial summary judgment in all three cases on April 4, 2001. The court heard oral argument in all three cases on April 12, 2001.

## IV. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. *See* Rules of the Court of Federal Claims 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Here, there are no disputed issues of fact and both sides agree that determining the proper in-

terpretation of the original and amended CAS 413.50(c)(12) is a question of law, which may properly be resolved on summary judgment. *See Perry v. Martin Marietta Corp.*, 47 F.3d 1134, 1137 (Fed.Cir.1995); *United States v. Boeing Co.*, 802 F.2d 1390, 1393 (Fed.Cir.1986) (citations omitted).[12]

## V. REGULATORY HISTORY AND AGENCY INTERPRETATIONS

At issue in this matter is the proper interpretation of the original CAS 413.50(c)(12) and CAS 413.50(c)(12) as amended in 1995. In deciding the meaning of CAS 413.50(c)(12), both the original and the amended 1995 version, the court must be guided by the Cost Accounting Standard Board's, or "CASB's," intent in promulgating the two standards. *Perry*, 47 F.3d at 1137. The Federal Circuit set forth the proper focus for interpreting CASB promulgations in *Perry*, where it stated:

This case requires interpretation of two FAR provisions, FAR 52.230-3 and 52.230-4, which were incorporated into [the contractor's] CAS-covered contracts. These FAR provisions were intended to implement the CAS, the CAS being the source for the language and authority for these provisions of the FAR. *Thus our task in interpreting the meaning of these FAR provisions is ultimately to ascertain the CASB's intended meaning when it promulgated the CAS.*

*Id.* (emphasis added) (citing *Riverside Research Inst. v. United States*, 860 F.2d 420, 422 (Fed.Cir.1988)). Thus, by way of background, the court will first look to the authority of the CASB, the regulatory framework within which CAS 413 operates, its plain language, and its regulatory history to

10. An audit report conducted by the DCAA questioned $293,572,750 of the $311,450,592 that GM claims as the government's share of its pension deficit, because GM calculated the pension liability for the Allison Gas Turbine segment using interest rates of 5.6% and 5.25%, whereas GM's actuarial valuation reports from 1991 to 1995 show that GM's best estimate of anticipated experience includes a 9% interest rate.

11. As discussed in detail, infra Part V.A, FAR 52.230-2(a)(4)(i) authorizes an equitable adjustment in the event that the government requires a

change in the contractor's cost accounting practices that affects contract costs. 48 C.F.R. § 52.230-2(a)(4)(i) (1998). The phrase "change in cost accounting practice" is a term of art, and whether CAS 413 requires a change in accounting practice is an issue in this proceeding.

12. The present motions do not address whether the government or the contractor applied the appropriate actuarial or interest rate assumptions in determining the pension plan liabilities. Those questions are preserved for a later date.

determine the proper meaning of the original and amended CAS 413.50(c)(12).

## A. The CASB

CAS 413 was originally promulgated in 1978 under the authority granted to the CASB in the Defense Production Act Amendments of 1970, Pub.L. No. 91–379, § 719, 84 Stat. 796 (1970), *codified at* 50 U.S.C.App. § 2168 (repealed 1988) (hereinafter "Pub.L. No. 91–379, § 719"). The original CASB was an agent of Congress, independent of the executive branch, consisting of the Comptroller General and four other members appointed by the Comptroller General. Pub.L. No. 91–739, § 719(a).

Under the Act, the CASB was given the authority to "promulgate cost-accounting standards designed to achieve uniformity and consistency in the cost-accounting principles followed by defense contractors and subcontractors under Federal contracts." *Id.* § 719(g). In addition to promulgating cost accounting standards, the CASB was authorized "to make, promulgate, amend, and rescind rules and regulations for the implementation of cost-accounting standards." *Id.* § 719(h)(1).

Although Congress gave the CASB wide authority in promulgating standards governing the measurement, assignment, and allocation of costs, Congress gave the CASB only very limited authority over cost *"allowability"* or other matters related to the *pricing* of contracts.[13] This is because allowability and pricing are generally left to the discretion of the procuring agency.

Thus, as a general rule, the original CAS regulate the *allocation* of costs to cost objectives but do not regulate issues of cost *allowability.* As the CASB's May 1977 Restatement of Objectives, Policies and Concepts states:

**13.** The CASB enabling statute provides as follows:

> Such regulations shall require defense contractors and subcontractors as a condition of contracting to disclose in writing their cost-accounting principles, including methods of distinguishing direct costs from indirect costs and the basis used for allocating indirect costs, and to agree to a contract price adjustment, with

Allowability is a procurement concept affecting contract price and in most cases is established in regulatory or contractual provisions. An agency's policies on allowability of costs may be derived from law and are generally embodied in its procurement regulations....

Allocability is an accounting concept involving the ascertainment of contract cost; it results from a relationship between a cost and a cost objective such that the cost objective appropriately bears all of a portion of the cost....

Cost Accounting Standards provide for the definition and measurement of costs, the assignment of costs to particular cost accounting periods, and the determination of the bases for the direct and indirect allocation of the total assigned costs to the contracts and other cost objectives of these periods. *The use of Cost Accounting Standards has no direct bearing on the allowability of those individual items of cost which are subject to limitations or exclusions set forth in the contract or which are otherwise specified as unallowable by the Government.*

Cost Accounting Standards Board Restatement of Objectives, Policies and Concepts (May 1977), *reprinted in Cost Accounting Standards Guide* (CCH) ¶ 2915 (1984) (emphasis added).

This distinction between allocability under the CAS and allowability under the FAR is well recognized. The Federal Circuit has held that with respect to allocation of costs, the CAS supersedes any agency-specific regulation to the extent the regulation is inconsistent with the CAS. *Rice v. Martin Marietta Corp.,* 13 F.3d 1563, 1565 n. 2 (Fed.Cir. 1993) (citing *Boeing,* 802 F.2d at 1395). Conversely, the Federal Circuit has also held that procuring agencies retain "sole authority" with respect to the allowability of costs.

> interest, for any increased costs paid to a defense contractor by the United States because of the defense contractor's failure to comply with duly promulgated cost-accounting standards or to follow consistently his disclosed cost-accounting practices in pricing contract proposals and in accumulating and reporting contract performance cost data.
>
> *Id.* § 719(h)(1).

*Id.* at 1566 (citing *Boeing,* 802 F.2d at 1394). Accordingly, the fact that a cost is properly *allocated* under the CAS, does not necessarily mean that the cost is *allowable* under the FAR or other governing regulations. *Boeing,* 802 F.2d at 1394 (holding that "not all costs are deemed reasonable just because they have been incurred and measured, allocated and assigned in accordance with CAS requirements") (citations omitted).

During the years that the original CASB was in existence, from 1970 through 1988, the CASB promulgated nineteen cost accounting standards. A new CASB was established in 1988 under the Office of Federal Procurement Policy Act of 1988 ("OFPPA"). 41 U.S.C. § 422 (1994 & Supp. V 1999). Under the OFPPA, the original nineteen cost accounting standards, including CAS 413, remain in effect unless and until they are amended, superseded, or rescinded by the CASB. *Id.* § 422(j)(1).

The CAS apply to negotiated government contracts and subcontracts, including both flexibly-priced and firm-fixed-price contracts. 48 C.F.R. § 9903.201–1(a)–(b) (2000). The CAS are incorporated into government contracts pursuant to the "Cost Accounting Standards" clause ("CAS clause"), FAR 52.230–2(a).[14] *Id.* § 52.230(a). Under the CAS clause, contractors are required to comply with all CAS in effect at the time of award and to prospectively comply with any modifications or amendments to CAS. *Id.* § 52.230–2(a)(3). In this connection, in the event a contractor is required to make a change to its cost accounting practices, which affects contract cost, the contractor is entitled to an equitable adjustment under the changes clause of the contract. *Id.* § 52.230–2(a)(4)(i). The equitable adjustment provision of the CAS clause expressly provides that the contractor shall, "[a]gree to an equitable adjustment as provided in the Changes clause of this contract if the contract cost is affected by a change which, pursuant to subparagraph (a)(3) of this clause, the Contractor is required to make to the Contractor's established cost accounting practices." *Id.* Similarly, if the contractor

fails to comply with the CAS or the contractor's disclosed cost accounting practices, the CAS clause provides that the contractor shall agree to an equitable adjustment to the contract price or cost allowance. *Id.* § 52.230–2(a)(5).

## B. The Original CAS 413.50(c)(12)

CAS 413 and its companion provision on pensions, CAS 412, were promulgated to govern the measurement, assignment, and allocation of pension costs to government contracts. In the preamble to CAS 412, originally promulgated in 1975, the CASB explained the necessity of having specific cost accounting standards to address cost accounting for pension costs under government contracts:

> The need for such measurement and assignment criteria for contracts is particularly critical because of the long-range projections used in computing pension cost and because the many techniques available for measuring and assigning such cost have significant impacts there-on. The significant amounts involved in annual pension cost calculations, the changes in the mix of contractors' Government and commercial business, and the settlement of individual contracts long before actual pension costs can be determined create a special need to provide criteria relative to the assignment of pension costs among cost accounting periods and the allocation of such costs to the cost objectives of the periods.

40 Fed.Reg. 43,873, 43,874 (Sept. 24, 1975).

The original CAS 412, requires, *inter alia,* government contractors with contracts subject to the CAS to measure annually their pension plan assets and liabilities and to allocate pension plan gains and losses to their various contracts. 4 C.F.R. § 412.20 (1986). To this end, with respect to defined-benefit pension plans such as those at issue here, CAS 412 requires that the amount of pension cost for each cost accounting period be measured using "an actuarial cost method." *Id.* § 412.40(b)(1). CAS 412 further provides that fluctuations reflected by the annual mea-

---

**14.** In particular, the CAS clause must be incorporated into negotiated contracts and subcon-

tracts over $500,000 unless an exemption applies. *Id.* §§ 52.230–2(a), 9903.201–1(a)–(b).

surement of pension costs should be amortized over a period of years. *Id.* § 412.50(a)(1).

CAS 413 was promulgated in 1978 to address some additional issues relating to the amortization of pension plan gains and losses that had been left open by CAS 412. CAS 413 became effective on March 10, 1978.[15] *Id.* § 413.80(a). The CASB explained its intent in promulgating CAS 413 as follows:

> A purpose of this Standard is to provide guidance for adjusting pension cost by measuring actuarial gains and losses and assigning such gains and losses to cost accounting periods. The Standard also provides the bases on which pension cost shall be allocated to segments of an organization. The provisions of this Cost Accounting Standard should enhance uniformity and consistency in accounting for pension costs.

*Id.* § 413.20. In particular, CAS 413 provides that actuarial gains and losses shall be calculated annually and assigned to specific cost accounting periods, § 413.40(a), and that pension costs shall be allocated to segments of an organization, § 413.40(c). *Id.* § 413.40. In addition, CAS 413 requires that actuarial gains and losses shall be amortized over a 15-year period. *Id.* § 413.50(a)(2).

Important to this case, CAS 413 also addresses how actuarial gains and losses relating to pension costs should be treated when there is a "segment closing." *Id.* § 413.50(c)(12). The CASB recognized that a "segment closing" presents a unique situation that requires a separate accounting treatment because the contractor no longer has the ability to amortize ongoing actuarial gains or losses over future periods. As the CASB noted in the preamble accompanying the final rule published in the Federal Register:

> As a general rule, [CAS 413] ... is based on the concept that material actuarial gains and losses applicable to a segment will be taken into account in future cost accounting periods in determining the costs for the segment. *However, a prob-*

*lem arises in cases where a segment is closed. Because there are no future periods in which to adjust previously-determined pension costs applicable to that segment, a means must be developed to provide a basis for adjusting such costs.* This adjustment is not an actuarial gain or loss as defined in the Standard.

*Id.* Pt. 413, Preamble A (emphasis added). Thus, the CASB included the segment closing provision "to serve as a basis for recognizing and adjusting pension costs previously allocated to the segment being terminated." *Id.*

As required under the original CASB's authorizing legislation, CAS 413 went through several revisions and rounds of public comment. Pub.L. 91–379, § 719(i). In June 1976, the CASB staff circulated approximately 900 copies of a preliminary draft of the proposed CAS 413 to a large cross-section of companies, government agencies, professional and trade associations, actuaries, and other individuals. Cost Accounting Standards Board, Staff Paper, Cost Accounting Standard, Adjustment and Allocation of Pension Cost (Jan. 7, 1977). With respect to segment closings, the June 18, 1976 staff draft CAS 413 provided:

> If all, or substantially all, of a segment is closed, and a significant number of employees are thereby separated from the plan, the contractor shall compute a net gain or loss from the plan applicable to that segment.... *The net gain (or loss) shall be used as a basis for determining any appropriate adjustments consistent with existing Government contract regulations.* If the contracting parties agree, the net gain or loss may be assigned to the current or ensuing cost accounting period.

(Emphasis added).

On February 3, 1977, the CASB formally proposed a draft of CAS 413 and published it in the Federal Register. 42 Fed.Reg. 6591 (Feb. 3, 1977). The proposed CAS 413 segment closing provision, as published in the Federal Register, provided in relevant part:

---

**15.** Pursuant to CAS 413.80(2), CAS 413 became applicable to Teledyne on January 1, 1979, which was "the start of [the] next cost accounting peri-od beginning after the receipt of a contract to which this Cost Accounting Standard is applicable." *Id.* § 413.80(b).

"if a segment is closed and a significant number of employees are thereby terminated from the plan, the contractor shall compute a net gain or loss from the plan applicable to that segment.... *The net gain or loss from the plan for the segment shall be used as a basis for negotiating any appropriate adjustments.*" *Id.* at 6596, § 413.50(c)(13) (emphasis added).

Subsequently, on July 20, 1977, the CASB published its final rule for CAS 413 in the Federal Register. 42 Fed.Reg. 37,191, 37,-191–99 (Jul. 20, 1977). The original CAS 413.50(c)(12) provides:

*If a segment is closed, the contractor shall determine the difference between the actuarial liability for the segment and the market value of the assets allocated to the segment, irrespective of whether or not the pension plan is terminated.* The determination of the actuarial liability shall give consideration to any requirements imposed by agencies of the United States Government. In computing the market value of assets for the segment, if the contractor has not already allocated assets to the segment, such an allocation shall be made in accordance with the requirements of paragraph (c)(5)(i) and (ii) of this section. The market value of the assets allocated to the segment shall be the segment's proportionate share of the total market value of the assets of the pension fund. The calculation of the difference between the market value of the assets and the actuarial liability shall be made as of the date of the event (e.g., contract termination) that caused the closing of the segment. If such a date cannot be readily determined, or if its use can result in an inequitable calculation, the contracting parties shall agree on an appropriate date. *The difference between the market value of the assets and the actuarial liability for the segment represents an adjustment of previously-determined pension costs.*

*Id.* at 37,198, § 413.50(c)(12) (emphasis added).

As noted above, although the accounting required under CAS 413.50(c)(12) is triggered only when a "segment" is "closed," CAS 413 only defined "segment," and did not define the term "closed." Again, "segment" is defined as "[o]ne of two or more divisions, product departments, plants, or other subdivisions of an organization reporting directly to a home office, usually identified with responsibility for profit and/or producing a product or service." 4 C.F.R. § 413.30(a)(11).

CAS 413 includes various illustrations to assist the government and contractors with application of the standard. *Id.* § 413.60. In CAS 413.60(c)(8), the CASB provided the following illustration of the adjustment required in the event of a segment closing:

Contractor K has a five-year contract to operate a Government-owned facility. The employees of that facility are covered by the contractor's overall defined-benefit pension plan which covers salaried and hourly employees at other locations. At the conclusion of the five-year period, the Government decides not to renew the contract. Although some employees are hired by the successor contractor, as far as Contractor K is concerned, the facility is closed. Pursuant to § 413.50(c)(12), Contractor K must compute an unfunded actuarial liability for the pension plan for that facility. The contractor first calculates the actuarial liability as of the date that contract expired. Because many of Contractor K's employees are terminated from the pension plan, the Internal Revenue Service considers it to be a partial plan termination, and thus requires that the terminated employees become fully vested in their accrued benefits to the extent such benefits are funded. Taking this factor into consideration, the actuary calculates the actuarial liability as amounting to $12.5 million. The contractor must then determine the market value of the pension fund assets allocable to the facility.... In this case, the market value of the segment's assets amounted to $13.8 million. Thus, for this facility the value of pension fund assets exceeded the actuarial liability by $1.3 million. *This amount indicates the extent to which the Government over-contributed to the pension plan for the segment and, accordingly, indicates the ex-*

*tent to which prior years' pension costs are subject to adjustment.*

*Id.* § 413.60(c)(8) (emphasis added).

## C. The 1995 Amended CAS 413.50(c)(12)

As noted above, in 1988 Congress established a new CASB under the OFPPA.[16] 41 U.S.C. § 422. The new CASB was tasked with amending CAS 412 and CAS 413 to address certain issues that had arisen in connection with the application of the original CAS 412 and CAS 413. 60 Fed.Reg. 16,534, 16,534 (March 30, 1995). More specifically, when CAS 412 and CAS 413 were originally promulgated the primary concern was that pension funds were not fully funded, whereas when the new CASB was considering its revisions, the concern had shifted to the problems associated with over funded pension plans. As the CASB explained in the Background section to the amended CAS 412 and CAS 413:

> Adequate or minimum, rather than excess funding, concerned pension managers of that era. Over the intervening years, government contractors' pension plans have become more adequately funded. At the same time, limits on the maximum amount of benefits that can be provided by a qualified pension plan have been considerably constrained in real terms. At the time the previous coverage was promulgated, there was little or no inconsistency between an orderly method of accruing pension costs and a contractor's ability to concurrently fund those accruals....
>
> To address questions concerning overfunded pension plans, the Board added coverage to CAS [413] defining what constitutes a segment closing and providing greater specificity regarding accounting for pension costs when segments are closed or pension plans are terminated.

*Id.* at 16,534–35.

The reasons for over funded pension plans can be traced to changes in the tax laws, the economic market, and the diminishing size of the defense industry labor force. After the original pension cost accounting standards were enacted, the Tax Reform Act of 1986 and the Omnibus Budget Reconciliation Act of 1987 ("OBRA") amended the federal tax code to prohibit over funding of pension plans by establishing a "full-funding" limitation on the tax deductibility of contractors' contributions to pension plans. *Id.* at 16,534. This full-funding limitation was not consistent with certain CAS provisions that required contractors to continue making contributions in order to ensure that future years' contributions would remain allowable. *Id.* The CASB resolved the conflict between the CAS and the full-funding limitations in the tax law with the 1995 amendments to CAS 412 and 413. *Id.* In addition, market forces contributed to the creation of significantly over funded pension plans. In a 1991 Staff Discussion Paper, the CASB noted that the combination of unprecedented growth in the stock market and the reduction in size of the labor force employed by the national defense industry led to billions of dollars in pension plan surpluses. Cost Accounting Standards Bd., Staff Discussion Paper, "Accounting for Fully-funded Defined Benefit Pension Plans," at 4–5, 8 (Aug. 19, 1991).

In response to these changes in the pension fund arena, the government began to act. First, in August 1989 the FAR was amended to provide the government with a share of the pension surplus taken out of the pension plan funds upon a contractor's termination of its pension plans. In the preamble to the FAR amendments the FAR Council noted that contractors were terminating pension plans and keeping the excess funds for their own use:

> Charges for pension costs have been accepted on Government contracts on the basis that funding was irrevocable and therefore that the Government would participate in all gains and losses incurred by pension plans. In recent years, many pen-

---

16. The OFPPA gives the CASB the "exclusive authority to make, promulgate, amend, and rescind cost accounting standards and interpretations thereof designed to achieve uniformity and consistency in the cost accounting standards governing measurement, assignment and allocation of costs to contracts with the United States." *Id.* § 422(f). Under section 422(g)(2) of the Act, new standards do not become effective until "120 days after publication in the Federal Register." *Id.* § 422(g).

sion plans have been terminated and excess pension plan assets have reverted to and have been used by the sponsoring company for other purposes. Such proceeds represent an adjustment of prior period's pension costs. If the actual cost had been known, the prices the Government previously paid would have been reduced commensurately.

52 Fed.Reg. 4084, at 4084 (Feb. 9, 1987) (codified at 48 C.F.R. § 31.205–6(j), effective September 30, 1989).

Next, in 1993, the Office of the Inspector General for the Department of Defense issued an oversight report that identified the differing and conflicting interpretations of the CAS 413 segment closing provision:

Unclear provisions in CAS 413.50(c)(12) and FAR 31.205–6(j) continue to make it difficult to settle pension issues. As a result, the Government has not received its fair share of pension plan excess assets amounting to $114.6 million for those unresolved pension plan terminations and business segment closings.

We also found there are disagreements between the DLA ["Defense Logistic Agency"] and the DCAA on how to implement the CAS 413.50(c)(12) provision for adjusting previously determined costs. The DCAA interprets the CAS 413 to require the contractor to account for all pension fund assets and liabilities related to a closed segment and to adjust previously determined pension costs allocated to all the CAS covered contracts. Support for that position is in the CAS contract clause at the FAR 52.230–3, which stipulates that contractor failure to comply or follow a prescribed CAS entitles the Government to cost recovery on all contracts. Instead of referring to the CAS contract clause, the DLA has accepted an adjustment in accordance with the credits provision in FAR 31.201–5 that results in cost recovery on cost type contracts only.

Office of the Assistant Inspector General for Audit Policy and Oversight, Office of the Inspector General, Dept. of Defense, Rpt. on Dept. of Defense Oversight of Defense Contractor Pension Plans, No. APO 93–011, at 6 (May 7, 1993).

In response to the concerns of the Inspector General and others, the CASB amended CAS 413 in 1995. The CASB's amendments to CAS 413 made two significant changes. First, the 1995 CAS 413 added a specific definition of the phrase "segment closing" to expressly include the sale of a division. CAS 413.30(a)(20) provides as follows:

*Segment closing* means that a segment has (i) been sold or ownership has been otherwise transferred, (ii) discontinued operations, or (iii) discontinued doing or actively seeking Government business under contracts subject to this Standard.

48 C.F.R. § 9904.413–30(a)(20) (1995).

Second, the 1995 CAS 413 established a specific formula for allocating a pension surplus or deficit between the government and the contractor. In this connection, while the amended segment closing provision retains the original CAS 413.50(c)(12) language regarding the calculation of the adjustment, it goes on to explain in detail how the adjustment should be applied. In particular, subsections (vi) and (vii) of the amended CAS 413.50(c)(12) provide as follows:

(vi) The Government's share of the adjustment amount determined for a segment shall be the product of the adjustment amount and a fraction. The adjustment amount shall be reduced for any excise tax imposed upon assets withdrawn from the funding agency of a qualified pension plan. The numerator of such fraction shall be the sum of the pension plan costs allocated to all contracts and subcontracts (including Foreign Military Sales) subject to this Standard during a period of years *representative of the Government's participation in the pension plan*. The denominator of such fraction shall be the total pension costs assigned to cost accounting periods during those same years. This amount shall represent an adjustment of *contract prices* or *cost allowance* as appropriate. The adjustment may be recognized by modifying a single contract, several but not all contracts, or all contracts, or by use of any other suitable technique.

(vii) *The full amount of the Government's share of an adjustment is allocable, with-*

*out limit, as a credit or charge during the cost accounting period in which the event occurred and contract prices/costs will be adjusted accordingly.* ·However, if the contractor continues to perform Government contracts, the contracting parties may negotiate an amortization schedule, including interest adjustments. Any amortization agreement shall consider the magnitude of the adjustment credit or charge, and the size and nature of the continuing contracts.

*Id.* § 9904.413–50(c)(12) (emphasis added). These subsections are noteworthy additions to CAS 413.50(c)(12) because they expressly provide for recovery of the surplus or deficit pension assets under both flexibly-priced contracts and firm-fixed-price contracts.

The 1995 CAS 413 also contains specific provisions governing the effective date of the provision and the method by which contractors shall transition from accounting for pension costs under the original CAS 413 to accounting for pension costs under the 1995 CAS 413. CAS 413.63 sets forth the effective date of the provision as follows:

(a) This Standard is effective as of March 30, 1995.

(b) This Standard shall be followed by each contractor on or after the start of its next cost accounting period beginning after the receipt of a contract or subcontract to which this Standard is applicable.

(c) Contractors with prior CAS-covered contracts with full coverage shall continue to follow Standard 9904.413 in effect prior to March 30, 1995, until this Standard, effective March 30, 1995, becomes applicable following receipt of a contract or subcontract to which this revised Standard applies.

*Id.* § 9904.413–63(a)–(c) (1995).

The transition provision, CAS 413.64, further provides that:

(a) To be acceptable, any method of transition from compliance with Standard 9904.413 in effect prior to March 30, 1995, to compliance with Standard 9904.413 in effect as of March 30, 1995, must follow the equitable principle that costs, which have been previously provided for, shall not be

redundantly provided for under revised methods. Conversely, costs that have not previously been provided for must be provided for under the revised method.

. . .

(c) ... this Standard, effective March 30, 1995, clarifies, but is not intended to create, rights of the contracting parties, and specifies techniques for determining adjustments pursuant to 9904.413–50(c)(12). These rights and techniques should be used to resolve outstanding issues that will affect pension costs of contracts subject to this Standard . . . . .

(e) *All adjustments shall be prospective only. However, costs/prices of prior and existing contracts not subject to price adjustment may be considered in determining the appropriate transition method or adjustment amount for the computation of costs/prices of contracts subject to this Standard.*

*Id.* § 9904.413–64(a), (c), (e) (1995) (emphasis added).

### D. Defense Contract Management Command's Policy Change Notice 99–295

Following promulgation of the 1995 amendments to CAS 413, the government took the position that the 1995 amendments to CAS 413.50(c)(12) reflected the proper interpretation of the original CAS 413.50(c)(12). As support for its position, the government relied on the transition provision, CAS 413.64(c), which provides that the 1995 CAS 413 "clarifies, but is not intended to create, rights of the contracting parties." Relying on this language, the government maintained that in the event of a segment closing, whether before or after the effective date of the new CAS 413, the government is entitled to a current period adjustment in the amount of its proportionate share of the pension surplus attributable to all CAS-covered contracts, including both firm-fixed-price and flexibly-priced contracts. Also consistent with the 1995 version of CAS 413, the government interpreted the term "segment closing" under the original CAS 413.50(c)(12) to include a contractor's sale of a division.

In September 1999, the Defense Contract Management Command ("DCMC") officially

changed its position with respect to the application of the 1995 CAS 413.50(c)(12) to firm-fixed-price contracts. *See* DCMC Policy Change Notice No. 99–925 (September 2, 1999). The change in position was precipitated by the Armed Services Board of Contract Appeals decision in *Gould, Inc.,* ASBCA No. 46759, 97–2 BCA ¶ 29,254, at 145,531 (Sept. 19, 1997). In particular, the *Gould* decision addressed the applicability of the original CAS 413.50(c)(12) to Gould's sale of five divisions or segments in 1987 and 1988. *Id.* The ASBCA upheld the government's position that Gould's sale of the five divisions constituted segment closings under the original CAS 413. *Id.* at 145,536. However, the ASBCA rejected the government's contention that the 1995 CAS 413 clarifies the meaning of the segment closing adjustment called for under the original CAS 413. *Id.* at 145,547. Instead, the ASBCA determined that "any 'adjustment of previously-determined pension costs' should be reflected on [Gould's] books as an adjustment to pension cost in the period of the segment closing." *Id.* at 145,546.

The ASBCA further concluded that the government was not entitled to recover the portion of the pension surplus allocable to Gould's firm-fixed-price contracts. *Id.* at 145,547. The ASBCA reasoned that the plain language of CAS 413.50(c)(12) "refers to an adjustment of costs as opposed to an adjustment of prices." *Id.* Because firm-fixed-price contracts are not adjusted for changes in costs, FAR 16.202–1, the only way to recoup the surplus under firm-fixed-priced contracts would be through an agreement for a price adjustment.[17] In addition, the ASBCA found that the administrative history of the original CAS 413.50(c)(12) "supports an interpretation that the CAS Board intended to resolve the cost issues relating to the adjustment as opposed to the pricing issues." *Id.*

The DCMC's Policy Change Notice No. 99–295 states in pertinent part:

> Pursuant to *Gould,* 97–2 BCA P 29,254, firm-fixed-price contracts entered into prior to the applicable date of the revised

CAS 413 shall be excluded from the calculation of the pension adjustment at segment closing.

Firm-fixed-price contracts entered into after the applicable date of the revised CAS 413 shall be included in the calculation of the pension adjustment at segment closing.

DCMC Policy Change Notice No. 99–295 (September 2, 1999). The government contends that its position in this case, as well as in the *GE* and *GM* cases, is the same as that adopted by the ASBCA in *Gould, Inc.* and reflected in DCMC's policy change.

## VI. THE MERITS

It is against this complex regulatory backdrop that the court will first analyze the TES sale, which occurred under the original CAS 413, and then the TVS sale, which occurred after CAS 413 was amended in 1995. The court notes that GE's sales of the GE Aerospace and GE MAO divisions and GM's sale of the Allison Turbine Gas division also predate the amended CAS. Accordingly, the court will examine GE's and GM's arguments when it examines the TES sale.

### A. The TES Sale

#### 1. The Sale of a Segment Is a "Segment Closing" Under the Original CAS 413.50(c)(12)

At the outset, the court must first decide whether the original CAS 413 segment closing provision is triggered, if at all, by the sale of the TES division. Teledyne argues that the "sale" of TES to Litton was not a "segment closing" under the original CAS 413.50(c)(12). Teledyne contends that the original CAS 413 extends only to situations where the segment stops operating altogether, and does not extend to situations where the segment is sold and continues under a new owner. Because TES continued as an ongoing concern with Litton, Teledyne argues that the TES sale was not a "segment closing."

Teledyne begins its argument with the dictionary definition of the word "close" when used in connection with a business. Tele-

---

17. FAR 16.202–1 states that a "firm-fixed-price contract provides for a price that is not subject to any adjustment on the basis of the contractor's cost experience." 48 C.F.R. 16.202–1 (1998).

dyne quotes the Webster Dictionary definition, which states that to "close" a business means to "stop or suspend [its] operations." (*Webster's New World Dictionary* (2d col. ed.1986)). Teledyne also cites Blacks Law Dictionary, which defines "closing" a business to mean "[t]o finish, bring to an end, conclude, terminate, complete, wind up ... [t]o suspend or stop operations of." (*Blacks Law Dictionary* (5th ed.1979)). Teledyne argues that these definitions demonstrate that CAS 413 is triggered only when a "segment" ceases operations.

Next, Teledyne argues that its plain reading of "close" is confirmed by the illustrations accompanying the original CAS 413. In Teledyne's view, the segment closing illustration in CAS 413.60(c)(8), quoted above, does not describe its sale of TES because in that illustration, the CASB indicated that CAS 413.50(c)(12) would only be triggered when the segment itself ceased operations. *See* 4 C.F.R. § 413.60(c)(8). In the illustration, the segment closing provision is triggered when a government-owned-contractor-operated ("GOCO") facility loses its government contract and terminates its business. *Id.* Unlike the illustration, Teledyne argues, TES will continue operations under Litton. Teledyne further asserts that the illustration in CAS 413.60(c)(5) more adequately depicts the TES sale. *See id.* § 413.60(c)(5). In the illustration in CAS 413.60(c)(5), when a segment is acquired by another contractor and all pension liabilities are transferred to that new contractor, the CASB does *not* characterize the sale as a segment closing. *Id.*

Finally, Teledyne argues that the regulatory history supports its view that a sale of a segment is not a segment closing. Teledyne points to a May 14, 1976 Background Paper by the CASB staff that explains: *"Because the plan is terminated for that business unit and the business unit is no longer a going concern,* the Standard requires that assets be valued at market." Letter, Cost Accounting Standards Board, Background Paper, Cost Accounting Standard, Composition, Measurement, and Allocability of Pension Cost, Arthur Schoenhaut to CASB Members, at 20 (August 29, 1974) (emphasis added). Similarly, in the 1977 proposed draft standard, the

CASB staff pointed out that "the proposed Standard applies the provision to *segments whose constructive operations cease to exist.* At the suggestion of several commentators, a revision was made to Section 413.50(c) to set forth the *contrast between on-going and closed segments."* Letter, Cost Accounting Standards Board, Staff Paper, Cost Accounting Standard, Adjustment and Allocation of Pension Cost, Arthur Schoenhaut to CASB Members, at 29 (January 17, 1977) (emphasis added). Teledyne notes that these statements confirm that the CASB staff was concerned with a segment closing only when the business unit was no longer ongoing.

The government argues that Teledyne's reading of CAS 413.50(c)(12) is cramped, and that Teledyne's argument defeats the purpose of the original CAS 413 segment closing provision. In the government's view, the CAS 413 segment closing provision is triggered when the contractor's decision to cease operations or sell the segment makes it impossible for the government to recoup the surplus attributable to the government's contributions through adjustments to future accounting periods. The government argues that by linking the application of CAS 413.50(c)(12) to the complete cessation of a segment's operations, Teledyne fundamentally misapprehends the intent and purpose of the standard. The focus of CAS 413.50(c)(12), according to the government, is properly on whether there are future accounting periods in which to amortize actuarial gains and losses and to adjust previously-determined pension costs. If the "sale" of the segment results in the government's inability to amortize against future cost accounting periods, the sale amounts to a "segment closing."

The court agrees with the government that the sale of the TES division was a "segment closing" within the meaning of the original CAS 413.50(c)(12). Because Teledyne sold TES to Litton, even though it retained responsibility for the defined-benefit pensions, the segment "closed" for Teledyne's purposes, despite the fact that the work of the segment continued under Litton's ownership. The CAS 413 segment closing adjustment was triggered because Teledyne retained re-

sponsibility for the pensions, but not the contracts over which the gains and losses attributable to the government's share of pension costs would ordinarily be amortized.

Contrary to Teledyne's argument, the court's finding is confirmed by the illustration in CAS 413.60(c)(8), quoted above. In illustration CAS 413.60(c)(8), Contractor K is replaced by a successor contractor, who will continue operations at the GOCO facility. 4 C.F.R. § 413.60(c)(8). In fact, the illustration notes that the successor contractor will hire some of Contractor K's employees to continue the work. *Id.* Thus, the example expresses in plain terms that so long as Contractor K no longer has the contract, the business is closed, regardless of the fact that the work will continue with the new contractor: "Although some employees are hired by the successor contractor, as far as Contractor K is concerned, the facility is closed" and Contractor K "must compute an unfunded actuarial liability for the pension plan for that facility." *Id.*

Teledyne is in the same position as Contractor K in illustration CAS 413.60(c)(8). Teledyne sold the TES segment to Litton, who will continue the business with some former Teledyne employees. As far as Teledyne is concerned, however, the TES segment is closed, and therefore Teledyne must compute an unfunded actuarial liability for the pension plan for the segment. As the CASB stated in the preamble to the original CAS 413, where "there are no future periods in which to adjust previously-determined pension costs applicable to that segment," the contractor must perform a final segment closing adjustment. *Id.* Pt. 413, Preamble A.

In view of the foregoing, Teledyne's contention that it is in the same position as the contractors discussed in the illustration at CAS 413.60(c)(5) is also unsupported. In that illustration, the segment closing provision is not triggered because the new segment owner also takes on the responsibility for the pension plans. *Id.* § 413.60(c)(5). In that circumstance, because the new owner continues to have government contracts against which pension gains and losses can be amortized, the segment closing adjustment is not triggered.

Finally, the court notes that every other tribunal to examine the issue has also concluded that a segment sale is a segment closing. In *Gould, Inc.,* the ASBCA concluded that Gould's "sale" of a division was a "segment closing" because, "although the businesses operated by the various divisions remained open, as far as [Gould] was concerned they were closed." 97–2 BCA ¶ 29,-254, at 145,538. Likewise, in *Bicoastal Corp.,* the Bankruptcy Court concluded that Bicoastal's sale of a division and retention of responsibility for the pension plan associated with the division was a "segment closing." 124 B.R. 593, 597 (1991). The Bankruptcy Court stated that "the contractual relationship between a contract entity and the Government reached an end and, therefore, the legal ramification following from the segment closing would come into play." *Id.*

For the same reasons, the court here concludes that the sale of TES to Litton is a segment closing under the original CAS 413.50(c)(12). Accordingly, the government correctly required Teledyne to perform a segment closing adjustment upon the sale of the segment.

### 2. CAS 413, By Its Terms, Does Not Provide for Recovery of Any Pension Plan Surplus or Deficit Attributable to Firm–Fixed–Price Contracts

Of all the issues presented in this case, whether CAS 413 authorizes the recovery of any pension surplus or deficit attributable to government pension contributions under firm-fixed-price contracts has the most significant financial impact.

#### a. *CAS 413.50(c)(12) Requires That the Contractor Examine Both Firm–Fixed–Price Contracts and Flexibly–Priced Contracts*

■ The crucial language of CAS 413.50(c)(12) provides that the *"difference between the market value of the assets and the actuarial liability for the segment represents an adjustment of previously-determined pension costs."* 4 C.F.R. § 413.50(c)(12) (emphasis added). GE argues that CAS 413.50(c)(12), by its terms, does not extend to

the pension surplus or deficit attributable to firm-fixed-price contracts. GE contends, based on the reasoning in *Gould, Inc.*, that by using the phrase "previously-determined pension costs," the CASB meant that the CAS 413 segment closing adjustment would apply only to flexibly-priced contracts that provide for cost reimbursement. *See Gould, Inc.*, 97–2 BCA ¶ 29,254, at 145,547. The government and Teledyne agree with GE that there is no recovery of any pension surplus or deficit attributable to firm-fixed-price contracts. However, they argue that the bar to recovery under firm-fixed-price contracts is based on the terms of the contracts.

Although GE's argument has some facial appeal, ultimately it is not supported by the language of CAS 413' regulatory history. The preamble to CAS 413 plainly states that the Standard extends to all "negotiated government contracts," which must be read to include negotiated firm-fixed-price contracts. The CASB provided in the preamble that the Standard is intended "to establish the criteria for measuring the proper amount of pension cost to be assigned to cost accounting periods for subsequent allocation to *negotiated government contracts*." 4 C.F.R. Pt. 413, Preamble A (emphasis added). It is undisputed that "negotiated government contracts" covered by the CAS include both firm-fixed-price and flexibly-priced contracts.[18] *See* CAS 201–1(a)–(b) (defining the applicability of the CAS). In such circumstances, the court finds that in determining the pension surplus or deficit attributable to government contributions, the contractor must examine firm-fixed-price and flexibly-priced contracts because CAS 413.50(c)(12) applies to both types of contracts. Whether CAS 413.50(c)(12) by its terms also authorizes recovery of the surplus or deficit attrib-

utable to those contracts is a separate issue that is examined below.

b. *The Portion of the CAS 413 Segment Closing Adjustment Attributable to Government Contributions Under Firm–Fixed Price Contracts Is Not Recoverable Absent an Express Contract Provision Providing for Recovery*

■ Teledyne, GE (in the alternative), and the government contend that the contract terms, and not CAS 413.50(c)(12), determine whether any portion of the segment closing adjustment is recoverable. With respect to firm-fixed-price contracts, Teledyne, GE, and the government contend that the CAS 413 segment closing adjustment is not recoverable because under firm-fixed-price contracts, the parties are not entitled to a change in contract price based on an increase or decrease in actual costs. *See* 48 C.F.R. § 16.202–1 ("A firm-fixed-price contract provides for a price that is not subject to any adjustment on the basis of the contractor's cost experience in performing the contract. This contract type places upon the contractor maximum risk and full responsibility for all costs and resulting profit or loss."). *See, e.g., Dalton v. Cessna Aircraft Co.*, 98 F.3d 1298, 1305 (Fed.Cir.1996) ("Because fixed-price contracts do not contain a method for varying the price of the contract in the event of unforeseen circumstances, they assign the risk to the contractor that the actual cost of performance will be higher than the price of the contract."); *Loral Corp. v. United States*, 193 Ct.Cl. 473, 434 F.2d 1328, 1330 (1970) (stating that under firm-fixed-price contracts, the agreed-upon price "remains fixed and it is not subject to further negotiation, unless otherwise provided in the contract"); *General Dynamics Corp.*, ASBCA No. 49339, 97–2

---

18. This is consistent with the CASB's statutory mandate, which provides that the cost accounting standards shall be used in connection with "all negotiated prime contract and subcontract national defense procurements with the United States in excess of $100,000." Pub.L. No. 91–379, § 719(g). The Senate Report on the CASB's enabling statute further explains what Congress intended to include in "negotiated government contracts":

There are two basic types of negotiated procurement contracts. One is termed a fixed price contract where the final price negotiated remains fixed unless a change is mutually agreed to. The second type is termed a cost-reimbursement contract wherein the final price depends upon the actual costs incurred during the life of the contract. In either case, an accurate measurement of cost is required. S.Rep. No. 91–890, *reprinted in* 1970 U.S.C.C.A.N. 3768, 3770.

BCA ¶ 29,167, at 145,030–31 (Jul. 24, 1997) (holding that the government "assumes the risk of any change as to after-relieved state taxes," where contract provision expressly provided for a refund of after-relieved federal taxes only). Accordingly, Teledyne, GE, and the government argue that without an express contract provision authorizing payment of the pension surplus or deficit under a firm-fixed-price contract, there is no recovery.[19]

With respect to flexibly-priced contracts, Teledyne, GE, and the government acknowledge that it may be possible to recover the CAS 413 segment closing adjustment. As discussed in greater detail below, the Allowable Cost and Payment clause, FAR 52.216–7(h)(2), and the Credits clause, FAR 31.201–5, require the contractor to credit the government in the event that the contractor receives a refund or credit of costs previously paid by the government. 48 C.F.R. §§ 52.216–7(h)(2) (1998), 31.201–5 (1998). By the same token, the contractor may be able to recover a pension deficit under the Allowable Cost and Payment clause as part of its allowable costs in the period of the segment closing. *Id.* § 52.216–7.

GM, which had only firm-fixed-price contracts with the government, argues that Teledyne, GE, and the government are wrong, and that recovery is not limited to only flexibly-price contracts. GM argues that under the CAS and implementing FAR provisions,

GM is entitled to additional funding to make up for its alleged pension deficit. For the reasons discussed below, the court rejects GM's arguments.[20]

First, GM argues that the CAS 413 segment closing provision requires that the parties "negotiate" a resolution of any pension surplus or deficit arising from the CAS 413.50(c)(12) calculation. GM contends that the final "negotiation" includes negotiations with respect to prices paid under firm-fixed-price contracts. In this connection, GM relies on the language of the proposed version of CAS 413, issued by the CASB on February 3, 1977. The proposed CAS 413 segment closing provision provides: "The net gain or loss from the plan for the segment shall be used as a basis for negotiating any appropriate adjustments." 42 Fed.Reg. at 6596, § 413.50(c)(13). GM argues that the CASB's reference to a "negotiation" means that CAS 413, by its terms, contemplates that when a segment closes, the contractor and the government must negotiate a payment to the contractor or the government depending on whether there is a deficit or surplus of pension assets.

The government contends that GM's argument is unsupported because the CASB deleted the reference to a negotiation in the final version of CAS 413.50(c)(12). As noted above, the final version of CAS 413.50(c)(12) simply states that the calculation "represents an adjustment of previously-determined pen-

---

**19.** Indeed, there are several cases where the government and contractor expressly negotiated provisions, separate from the CAS, regarding the government's rights to a pension surplus following the conclusion of a contract. For example in *Johnson Controls World Services, Inc. v. United States*, 44 Fed.Cl. 348 (1999), the Court of Federal Claims rejected a contractor's challenge to the government's claim to a pension plan surplus, where the contract contained a specific provision governing recovery of a pension surplus. In that case, the parties expressly provided in their fixed-price-incentive contract that, in the event of a segment closing, the contractor was required to perform an adjustment in accordance with CAS 413 and that any resulting surplus "shall be applied in reduction of any payment to be made by the Government under this contract or will otherwise be credited or paid by such other means as the Contracting Officer may direct." *Id.* at 351. Similar express contract language was noted by the court in *ITT Federal Support*

*Services, Inc. v. United States*, 209 Ct.Cl. 157, 165, 531 F.2d 522 (1976), as a basis for the government's ownership of all surplus pension assets that had accumulated in the pension fund created for the benefit of plaintiff's employees. In particular, the court found persuasive several contract provisions that expressly gave title to the pension funds, including all revenues, to the government. *Id.* at 165, 531 F.2d 522. Here, however, the parties point to no such specific contract language granting a right to recover a pension surplus or deficit attributable to fixed-price contracts.

**20.** As noted, *supra* note 9, GM's deficit is in large part attributable to its use of a lower interest rate in calculating the CAS 413 segment closing adjustment. GM argues that the CAS 413 segment closing provision requires the interest rate change. This opinion does not address that question. *See supra* note 12.

sion costs." 4 C.F.R. § 413.50(c)(12). In such circumstances, the government argues the court cannot assume that a contractor and the government are required to renegotiate the prices of firm-fixed-contracts to make up for any pension surplus or deficit. To the contrary, the government contends that the CASB's decision to delete the reference to "negotiation" evidences a clear intent to disregard its proposed draft of the provision.

The court agrees with the government. Where, as here, GM's interpretation of CAS 413.50(c)(12) hinges on language that was eliminated from the final rule, the argument has no merit. *See Mass. Ass'n of Health Maint. Orgs. v. Ruthardt*, 194 F.3d 176, 185 (1st Cir.1999) (holding that "Congress sometimes can speak as clearly by opting not to enact proffered language as by enacting it") (citing *INS v. Cardoza–Fonseca*, 480 U.S. 421, 442–43, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987) ("Few principles of statutory construction are more compelling than the proposition that Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded in favor of other language.")). Because the CASB deleted any reference to a negotiation in the final version of the CAS 413 segment closing provision, the court finds that no such requirement exists.

For similar reasons, the court finds that GM's reliance on CASB staff documents is also misplaced. In particular, GM cites a series of file memoranda written by Mr. Bernard Sacks, a CASB staff person, which reflect Mr. Sacks's interpretation of the CAS 413 segment closing provision. Mr. Sacks states that the CAS 413 segment closing provision "leaves to the contracting parties the negotiation of how much to settle for," and that "the inclusion of the CAS clause in the contract embodies the provision of the Standard and provides a legal basis for making a settlement [under fixed-price contracts.]" Memorandum from Bernard Sacks to Files 3–4 (Apr. 13, 1978).

These documents are entitled to no weight in the court's analysis. First, the memoranda

upon which GM relies were prepared by one CASB staff person, and do not indicate that they were intended to reflect the intent of the entire CASB. GM has not produced any evidence to show that the CASB shared Mr. Sacks's view.[21] Second, the memoranda post-date the promulgation and effective date of the original CAS 413.50(c)(12), and therefore fail to provide contemporaneous evidence of the CASB's intent. As the government notes, this is not the type of evidence of the CASB's intent that the Federal Circuit contemplated in *Perry*. 47 F.3d at 1138–39 (looking to the illustrations and preamble accompanying the CAS as evidence of CASB intent). In such circumstances, the court has no basis to conclude that CAS 413.50(c)(12), by its own terms, requires that when a segment closes the parties must renegotiate previously-agreed-upon contract prices.

Second, GM's contention that it is entitled to an equitable adjustment in the amount of its pension deficit because the CAS 413 segment closing adjustment amounts to a "change in accounting practice" under FAR 52.230–3(a)(4)(i) is without merit. In particular, GM contends that the segment closing adjustment requires a change to its accounting practices because prior to the closing of the segment, GM was required to amortize actuarial gains and losses over future periods, whereas under CAS 413.50(c)(12) it can no longer amortize gains and losses. In addition, GM contends that the segment closing adjustment requires a change to its accounting practices because prior to the segment closing, the CAS required GM to use the actuarial value of assets to measure components of pension cost, but upon the segment closing GM is required to use the market value of the assets to determine the pension plans' liabilities. According to GM, the CAS 413 segment closing calculation therefore triggers the right to an equitable adjustment under FAR 52.230–2(a)(4)(i).

The government argues, in response, that GM is not entitled to an equitable adjustment because compliance with a pre-existing contract requirement, such as CAS 413.50(c)(12),

---

21. In its brief, GM makes much of the fact that the court limited discovery in its case. Although the court limited discovery in connection with

DOD's implementation of the original CAS 413 with respect to specific transactions, all of the known CASB documents were produced.

does not trigger a "change in accounting practices" within the meaning of FAR 52.230–2(a)(4)(i). The government argues that the government-mandated accounting changes contemplated under FAR 52.230–2(a)(4)(i) involve situations where a cost accounting standard is amended after a contract is entered into, which results in an increase or decrease in contract costs not contemplated at the time the contract was made. Here, the government argues, GM knew it was obliged to comply with CAS 413.50(c)(12) when it entered into the CAS-covered contracts that contained the provision. *See* 48 C.F.R. § 52.230–2(a)(3) (requiring contractors to "[c]omply with all CAS ... in effect on the date of this contract"). As such, compliance with CAS 413.50(c)(12) became part of GM's accounting obligations once it entered into those contracts. In such circumstances, the government concludes, the segment closing did not require GM to change any of its accounting practices; rather, the segment closing simply triggered the previously-agreed-to method of calculation and adjustment.

The court agrees with the government here as well. As noted above, the CAS clause, FAR 52.230–2(a)(4)(i), requires the contractor to agree to an equitable adjustment as provided in the Changes clause if the contract cost is affected by a change to the contractor's established accounting practices that the government requires the contractor to make. *Id.* § 52.230–2(a)(4)(i). A "change to a cost accounting practice" is defined under the CAS as "any alteration in a cost accounting practice, as defined in [CAS 302–1]." [22] *Id.* § 9903.302–2 (1995). In the context of a government-mandated change in accounting practice, the limited case law makes plain that "a contractor is entitled to an equitable adjustment if its contract cost is affected by a change which it is required to make to its cost accounting practices *as a result of the issuance of a new standard.*" *PACCAR, Inc.,* ASBCA No. 27978, 89–2 BCA ¶ 21,696, at 109,079 (Feb. 13, 1989) (emphasis added). *See also Ford Aerospace and Comm. Corp.,* ASBCA No.

23833, 83–2 BCA ¶ 16,813, at 83,629 (August 31, 1983) (noting that the equitable adjustment provision of the CAS clause is "generally available only with respect to contracts awarded *prior* to the effective date of each new standard") (emphasis added).

That is plainly not the case here. GM's claim to an equitable adjustment is based on the requirements of the original CAS 413.50(c)(12), as applied to the contracts that contain that provision. Thus, the segment closing adjustment that GM is required to make under CAS 413.50(c)(12) does not arise from the application of a *new* cost accounting standard. Rather, GM's obligation to perform the segment closing adjustment is a pre-existing contract requirement that arises whenever a segment closes. Accordingly, the CAS 413 segment closing adjustment is not a change to GM's accounting practices, and GM is not entitled to an equitable adjustment to make up for the deficit it identified in calculating the CAS 413 segment closing adjustment as required.

Third, GM's contention that it is entitled to recover its pension deficit because federal defense agencies, up until this litigation, had uniformly interpreted CAS 413.50(c)(12) as requiring the recovery of any surplus or deficit attributable to government pension contributions under firm-fixed-price contracts is also without support. To the contrary, the court's review of the record reveals that federal defense agencies did not maintain a consistent interpretation and application of CAS 413.50(c)(12).

As noted above, the 1993 report by the Office of the Inspector General for the DOD, expressly noted that there were "disagreements between the DLA and the DCAA on how to implement the CAS 413.50(c)(12) provision for adjusting previously determined costs." Rpt. on Dept. of Defense Oversight of Defense Contractor Pension Plans, No. APO 93–011, at 6. Indeed, the DOD report found that while the DCAA relied upon the noncompliance provision of the CAS clause, FAR 52.230(a)(5), to require recovery of a

---

**22.** A cost accounting practice, as defined in CAS 302–1, means "any disclosed or established accounting method or technique which is used for allocation of cost to cost objectives, assignment of cost to cost accounting periods, or measurement of cost." *Id.* § 9903.302–1.

pension surplus under all CAS-covered contracts, including firm-fixed-price contracts, the DLA relied upon the credits provision at FAR 31.201–5, which resulted in recovery under cost-type contracts only. *Id.* Because CAS 413.50(c)(12) has not been consistently applied, the court finds no basis for giving deference to any of the DOD's interpretations. Moreover, as the Federal Circuit noted in *Perry,* because the CAS are not regulations of the Department of Defense, the value of its interpretations is largely irrelevant. 47 F.3d at 1137 (citing *Newport News Shipbuilding & Dry Dock Co. v. Garrett,* 6 F.3d 1547, 1551 (Fed.Cir.1993)). The court's focus in interpreting the CAS must be on the language of the CAS itself and the guidance provided by the CASB in the regulatory history.[23] *Id.*

Finally, the court finds that GM's reliance on the amended 1995 CAS 413.50(c)(12) to support its position regarding full recovery under the original CAS 413.50(c)(12) is also misplaced. As discussed above, like the original CAS 413.50(c)(12), the 1995 CAS 413.50(c)(12) provides that "the difference between the market value of the assets and the actuarial liability for the segment represents an adjustment of previously-determined pension costs." 48 C.F.R. § 9904.413–50(c)(12). However, the 1995 CAS 413 segment closing provision also expressly permits recovery by the government or the contractor of any pension surplus or deficit attributable to government pension plan contributions from both firm-fixed-price and flexibly-priced contracts. As previously noted, the amended CAS 413.50(c)(12)(vii) states, "The full amount of the Government's share of an ad-

justment is allocable, without limit, as a credit or charge during the accounting period in which the event occurred and contract prices/costs will be adjusted accordingly." *Id.* § 9904.413–50(c)(12)(vii). Ignoring the several new provisions added to the 1995 CAS 413.50(c)(12), GM contends that the court should not interpret the same language in both the original and the new CAS 413.50(c)(12) differently. GM contends that the additional language in CAS 413.50(c)(12) merely clarifies what was intended by the original CAS 413.50(c)(12).

Contrary to GM's contentions, however, the language of the new CAS 413 makes plain that the inclusion of the pension surplus or deficit attributable to firm-fixed-price contracts is a departure from the original CAS 413.50(c)(12). In the 1995 CAS 413, the CASB included CAS 413.64, which sets forth the "transition method" for implementing the new CAS 413. CAS 413.64 makes clear that recovery of the pension surplus attributable to fixed-price contracts is new.

CAS 413.64(e) states: "*All adjustments shall be prospective only. However, costs/prices of prior and existing contracts not subject to price adjustment may be considered in determining the appropriate transition method or adjustment amount for the computation of costs/prices of contracts subject to this Standard.*" *Id.* § 413.64(e) (emphasis added). Thus, by its plain terms, the new CAS 413 is simply advisory with respect to a pension surplus or deficit that is attributable to pension costs paid by the government under "prior and existing con-

---

**23.** In view of the foregoing, GM's reliance on the initial position of the government's expert, Dr. Lane Anderson, is misplaced. Dr. Anderson originally argued that CAS 413.50(c)(12) required a negotiation and that the government was entitled to full recovery of Teledyne's pension surplus. However, as described above, *see supra* Part V.D, once the decision in *Gould, Inc.* was issued, the government formally changed its position to hold that with respect to contracts entered into before enactment of the 1995 CAS 413.50(c)(12), the surplus or deficit attributable to firm-fixed-price contracts is not recoverable. *See* DCMC Policy Change Notice No. 99–295 (September 2, 1999).

In light of the government's change in position, the court finds that the government's earlier positions are entitled to no weight. While noth-

ing precludes the government from changing its policies in order to comply with an adverse decision issued by an administrative board or a court, neither the government nor the court is bound by the earlier position taken by the government. *Bowen v. Georgetown University Hospital,* 488 U.S. 204, 213, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988) ("Deference to what appears to be nothing more than an agency's convenient litigating position would be entirely inappropriate."). *See also Akzo Nobel Salt, Inc. v. FMSHRC,* 212 F.3d 1301, 1304 (D.C.Cir.2000) (finding deference unwarranted given "the flip-flops [in] the Secretary's position" and "litigation counsel's simultaneous advocacy of *several* different positions").

tracts" that do not contain the right to a "price adjustment." Clearly, the CASB would not have included a transition method with respect to prior and existing contracts not subject to price adjustment if recovery of a surplus or deficit of pension costs attributable to firm-fixed-priced contracts was otherwise provided for under the original CAS 413.50(c)(12). As the Federal Circuit has noted, the fact that an amendment is expressly made prospective leads to the conclusion that the amended language was not intended by the original enactment. *Newport News Shipbuilding*, 6 F.3d at 1564 (noting that the fact that Congress made amendments to the CDA prospective does not support the contention that the amended language was intended by the original legislation).[24]

The court is also guided here by the regulatory history of the 1995 CAS 413. The responses to the proposed rule for the 1995 CAS 413 segment closing adjustment contain many objections to the proposed inclusion of recovery of the surplus or deficit attributable to firm-fixed-price contracts in the amended CAS 413.50(c)(12). As the CASB notes in the preamble to the final rule, "Five commenters opposed the inclusion of fixed-price contracts in any formula used to determine

the Government's share [of the adjustment]."[25] 60 Fed.Reg. at 16,539–40.

In response to these comments, the CASB explained why it believes that the government should be entitled to recover the surplus attributable to the pension costs paid by the government under firm-fixed-priced contracts:

> Costs allocated to fixed-price contracts subject to [CAS 412] and [CAS 413] are included since the Government has participated in the funding of the plan through the payment of the estimated pension cost considered in the pricing of the contract. A risk/reward of a fixed-price contract is the deviation of actual costs from the estimated cost considered in the price. If a single period event, e.g., segment closing, plan termination, or benefit curtailment, alters the ongoing nature of the pension plan or segment, the effect on fixed-price contracts should be similar to that of an accounting practice change.[26]

*Id.* at 16,540. Notably, however, the CASB never states that the surplus attributable to firm-fixed-price contracts has always been included in the CAS 413.50(c)(12) adjustment. Certainly, the express inclusion of an approach to recover the surplus or deficit of the segment's pension plan attributable to firm-

24. At oral argument, GM endeavored to explain the transition clause by stating that the language regarding price adjustments was aimed at making clear that non-CAS covered contracts were now included in the CAS 413.50(c)(12) segment closing calculation. An examination of the new CAS 413.50(c)(12) does not support this reading. Nothing in the 1995 CAS 413.50(c)(12) indicates that the segment closing adjustment includes a pension surplus or deficit attributable to pension costs paid by the government under non-CAS covered contracts. In fact, the segment closing adjustment was not extended to non-CAS covered contracts until three years later, upon the enactment of amendments to FAR 31.205–6, implementing CAS 413.50(c)(12). The new FAR 31.205–6(j)(4), expressly provides how "contracts and subcontracts that are not subject to [CAS]" are to be considered in the segment closing adjustment. 48 C.F.R. § 31.205–6(j)(4) (1998). As such, GM's assertion that the CASB's reference to "prior and existing contracts not subject to price adjustment" refers to non-CAS covered contracts, as opposed to firm-fixed-priced contracts, is incorrect.

25. For example, Donald J. Kinlin, Chair of the Section of Public Contract Law for the American

Bar Association, submitted the following statement to the CASB in response to the proposed revisions to CAS 413:

> . . . Government payments under fixed-price contracts do not constitute an "over-contribution" to the plan. Under the payment terms of fixed-price contracts, the contractor—not the Government—bears the risk or reward of any differences between projected and actual costs for all categories of cost, including pension costs. A decrease or increase in pension costs after price negotiations does not entitle either party to adjust the contract price. Therefore, payment of the negotiated price should not be viewed as an over- or under-contribution by the Government.

Letter from Donald J. Kinlin, ABA Section of Public Contract Law, to Richard C. Loeb, Executive Secretary, CAS Board (January 4, 1994).

26. Interestingly, the CASB notes that the CAS 413 segment closing adjustment is "similar to that of an accounting practice change," yet, not *in fact* a change in accounting practice. This statement further undermines GM's erroneous contention that the original CAS 413 segment closing adjustment is a change in accounting practice.

fixed-price contracts would not have been necessary had firm-fixed-price contracts been included all along. Nor would commentators have objected to the inclusion of recovery under firm-fixed-price contracts under the new CAS 413 segment closing provision if that was always the understanding of the provision.[27]

Indeed, the significant change created under the 1995 CAS 413.50(c)(12) was also recognized in later amendments to the FAR, which were enacted to create consistency with the 1995 CAS 413. In 1998, FAR 31.205–6 was amended to combine the segment closing adjustment with the pension termination provision. The notice of proposed rulemaking accompanying the 1998 amendments to the FAR states as follows:

> Since the 1989 interim FAR rule was published, the Office of Federal Procurement Policy, Cost Accounting Standards Board, made *substantial* changes to CAS 412 and 413 relating to accounting for pension costs under negotiated Government contracts.... The changes in the final CAS rule addressed ... problems associated with overfunded pension plans. This proposed rule would ... provide other editorial changes to make FAR 31.001 and 31.205–6 consistent with the language of CAS 412 and CAS 413....[28]

62 Fed.Reg. 49,899, 49,900 (emphasis added). Importantly, there would have been little reason to amend the FAR if the pension surplus or deficit attributable to firm-fixed-price contracts was recoverable under the original CAS 413 segment closing adjustment. Indeed, the notice of proposed rulemaking indicates that the FAR was amended in response to the "substantial" changes in the 1995 CAS 413.

For all of these reasons, the court finds that the original CAS 413.50(c)(12), by its terms, does not allow for the recovery of any pension surplus or the payment of any pension plan deficit attributable to government-reimbursed pension costs under firm-fixed-price contracts. Thus, the portion of the CAS 413 segment closing adjustment that is attributable to government contributions under firm-fixed-price contracts is not recoverable absent an express contract provision providing for that recovery.

### 3. CAS 413.50(c)(12) Requires the Contractor to Allocate the Segment Closing Adjustment Between Firm–Fixed–Price Contracts and Flexibly–Priced Contracts That Gave Rise to the Surplus or Deficit

■ Having concluded that a pension surplus or deficit attributable to firm-fixed-price

**27.** For these same reasons, GM's reliance on the inclusion of fixed-price contracts in connection with other CAS provisions is misplaced. According to GM, the adjustment under CAS 413.50(c)(12) is no different than an adjustment of contract prices under CAS 413.50(a), which requires the amortization of annual pension gains and losses, or FAR 52.230–2(a)(5), which requires an equitable adjustment for the contractor's noncompliance with the CAS. The court disagrees. While similar policy reasons might support extending the CAS 413 segment closing provision to provide recovery under firm-fixed-price contracts, in fact the CASB did not elect to incorporate those policy judgments into the CAS 413 segment closing provision until it amended the provision in 1995.

**28.** Prior to the 1989 amendments to the FAR termination provision and the 1995 amendments to CAS 413, there simply was no right to recover excess costs paid by the government under firm-fixed-price contracts. As noted by the ASBCA in *NI Industries, Inc.*, the Cost Principles Committee of the FAR council, in discussing amendments to the FAR termination provision, stated that it " 'knows of no contract clause that pro-

vides a right [to] recapture' a reversionary credit under fixed price contracts," and noted that "a paramount purpose" of FAR 31.205–6(j) "is to provide contractual coverage for fixed-price contracts." ASBCA No. 34943, 92–1 BCA ¶ 24,631, at 122,905 (Nov. 29, 1991) (alteration in original).

GM, in its briefs, relies on the 1989 amendments to the FAR termination provision as support for its position that the surplus or deficit attributable to firm-fixed-price contracts is recoverable under the original CAS 413.50(c)(12). The court rejects this argument. The FAR termination provision is a separate provision written to address pension terminations, not segment closings, and therefore has no bearing on the interpretation of the original CAS 413 segment closing provision. A specific provision allowing for recovery of a segment closing adjustment under CAS 413 was not added to FAR 31.205–6(j)(4) until 1998. Moreover, as the discussion in *NI Industries* makes plain, there was no recovery under fixed-price contracts, in connection with a pension termination, until after FAR 31.205–6(j) was amended in 1989, well after CAS 413.50(c)(12) was promulgated.

contracts is not recoverable without an express contract provision (which is not at issue here), the court must next decide how to deal with the portion of the CAS 413 segment closing adjustment attributable to such contracts. Teledyne and GE argue that the original CAS 413.50(c)(12) requires the parties to allocate the segment closing adjustment between the flexibly-priced contracts and firm-fixed-priced contracts that gave rise to the surplus or deficit, such that the portion attributable to flexibly-priced contracts can be recovered pursuant to the contract terms. The government argues that it is not necessary to allocate the segment closing adjustment between contract types. Relying on the decision in *Gould, Inc.*, the government contends that once the CAS 413.50(c)(12) calculation is made, the entire amount of the adjustment should be allocated to the contractor's current indirect cost pool at the time of the segment closing. 97–2 BCA ¶ 29,254, at 145,546. Under the government's approach, any recovery is then based on the proportion of flexibly-priced contracts in the contractor's contract mix at the time of the contract closing, without regard to the historical proportion of firm-fixed-price contracts and flexibly-priced contracts under which the pension costs were actually paid.[29]

The government concedes that its approach would likely mean that recovery of the CAS 413 segment closing adjustment would bear no relationship to the parties' historic contract relationships, and thus could lead to inequitable results. For example, the government recognizes that despite years of making contributions to a segment's pension plans under flexibly-priced contracts, the

government would not recover any portion of the pension surplus if the contractor had only firm-fixed-priced contracts open in the period of the segment closing. Indeed, in *Gould, Inc.* this approach resulted in a $0.00 recovery for the government because in the year of the segment closing at issue in that case, all of the segment's government contracts happened to be firm-fixed-price contracts. 97–2 BCA ¶ 29,254, at 145,546.

The government further acknowledges that this is not the approach adopted by the CASB in the new CAS 413.50(c)(12). The new CAS 413.50(c)(12)(vi) requires the contractor to determine the government's share of the surplus or deficit in relation to pension costs paid by the government under CAS-covered contracts "during a period of years representative of the Government's participation in the pension plan." 48 C.F.R. § 9904.413–50(c)(12)(vi). That amount is then "allocable, without limit, as a credit or charge during the cost accounting period in which the event occurred and contract prices/costs will be adjusted accordingly." *Id.* § 9904.413–50(c)(12)(vii). Thus, under the new CAS 413.50(c)(12), the amount of the segment closing adjustment is based on the government's historic participation in the segment's pension plan, even though the recovery of the adjustment is in the current period at the time of the segment closing.

Despite the tremendous potential for a wholly inequitable result arising from its approach, the government argues that its approach is correct because it is consistent with the ordinary allocation of actuarial gains and

29. The government contends that this is the approach adopted by the DOD in response to *Gould, Inc.* in DCMC's Defense Policy Change Notice 99–295, discussed *supra* Part V.D. However, a careful reading of the policy change notice indicates that the DOD's approach is not the same as the approach for which the government is arguing here. In contrast to the government's approach, which allocates all of the surplus to the contractor's current indirect cost pool at the time of segment closing, the policy change notice states that the date of the contract shall determine whether contributions attributable to firm-fixed-price contracts shall be included in the CAS 413 adjustment:

Pursuant to *Gould*, 97–2 BCA P 29,254, firm-fixed-price contracts entered prior to the appli-

cable date of the revised CAS 413 shall be excluded from the calculation of the pension adjustment at segment closing. . . .

When an adjustment of previously determined pension cost is required due to a segment closing, the calculation of the adjustment depends on the date of the contracts. *For contracts entered into prior to the applicable date of the revised CAS 413, DCEs and ACOs shall exclude firm-fixed-price contracts from the calculation of the pension adjustment. For contracts entered into after the applicable date of the revised CAS 413, DCEs and ACOs shall include firm-fixed-price contracts in the calculation of the pension adjustment.*

DCMC Policy Change Notice No. 99–295 (September 3, 1999).

losses for an ongoing segment under CAS 413. The government cites other provisions of the original CAS 412 and 413, which require that actuarial gains or losses for an ongoing segment be amortized or spread over the cost of government contracts in future cost accounting periods, without regard to whether the gains or losses are attributable to firm-fixed-price or flexibly-priced contracts. *See* 4 C.F.R. §§ 412.50(a), 413.50(a)(2).

Teledyne and GE disagree with the government and contend that under the plain words of the original CAS 413.50(c)(12), which refers to "previously-determined pension costs," the adjustment must be allocated among the various contracts which gave rise to the pension surplus or deficit. *Id.* § 413.50(c)(12). Both Teledyne and GE argue that because the portion of the surplus or deficit attributable to government contributions made under firm-fixed-priced contracts is not recoverable, the amount attributable to those firm-fixed-price contracts must be identified in order to determine the amount of the adjustment that is recoverable.

For the reasons that follow, the court agrees with Teledyne and GE. First, the express terms of CAS 413.50(c)(12) contemplate that the parties look back to the contracts that gave rise to the surplus or deficit. CAS 413 expressly provides for an adjustment of *"previously-determined* pension costs." *Id.* § 413.50(c)(12). Clearly, the plain words suggest that the CAS 413 segment closing adjustment would represent an adjustment of the pension costs actually paid by the government in the past. In addition, the illustration in CAS 413.60(c)(8), which accompanies CAS 413.50(c)(12), is consistent with this view. The illustration states that the adjustment amount "indicates the extent to which the Government over-contributed to the pension plan for the segment and, accordingly, indicates the extent to which *prior*

*years' pension costs* are subject to adjustment." *Id.* § 413.60(c)(8) (emphasis added).

The CASB reiterated this intent in the preamble to CAS 413, which provides:

> As a general rule, the Standard being promulgated today is based on the concept that material actuarial gains and losses applicable to a segment will be taken into account in future cost accounting periods in determining the costs for the segment. However, *a problem arises in cases where a segment is closed. Because there are no future periods in which to adjust previously determined pension costs applicable to that segment, a means must be developed to provide a basis for adjusting such costs.* This adjustment is not an actuarial gain or loss as defined in the Standard.... *The Board emphasizes that the purpose of this provision is to serve as a basis for recognizing and adjusting costs previously allocated to the segment being terminated.*

*Id.* Pt. 413, Preamble A (emphasis added).

The illustration and the preamble together confirm that the CAS 413 segment closing adjustment was intended to account for the actuarial miscalculations of pension costs charged to the government in past accounting periods where there are no future accounting periods available for corrections. The purpose of the CAS 413 segment closing adjustment is to identify where the government may have over or under contributed to pension costs under prior contracts. However, the surplus or deficit attributable to those payments is only recoverable to the extent provided for in the contracts. Therefore, there is no logical or legal basis for relying on the current contract mix to set the amount of the recovery. Rather, the better approach is to identify the non-recoverable amount attributable to firm-fixed-priced contracts, and to then determine the rights of the parties with regard to the rest.[30]

---

30. In this connection, the court finds unpersuasive the government's argument that looking back to determine the type of contract that gave rise to the surplus or deficit would be administratively burdensome. Government contractors are required to maintain historic cost and pricing data that is used to formulate future costs and pricing under government contracts. In ad-

dition, government contractors should have the data with regard to the particular costs at issue here because the contractors would have submitted this information along with their tax returns. Indeed, the 1995 CAS 413.50(c)(12) calls for an historical approach to determining the government's proportionate share of any pension surplus or deficit. This would not be possible if

The government is not correct in arguing that the CAS 413 segment closing provision requires that the pension surplus or deficit should be treated the same as ordinary gains and losses under CAS 412.50(a) and CAS 413.50(a)(2) in connection with an ongoing segment. The CASB intentionally elected to treat a surplus or deficit attributable to the sale of a segment separately from the ordinary treatment of actuarial gains and losses for an ongoing segment. In the preamble to CAS 413, the CASB expressly stated that the segment closing adjustment "is not an actuarial gain or loss as defined in the Standard." [31] 4 C.F.R. Pt. 413, Preamble A.

In sum, the purpose of the CAS 413 segment closing provision is to look back and to determine whether the government over contributed or under contributed to the segment's pension plans. Established contract principles then allow for recovery against certain types of contracts. By ignoring the source of the pension contributions in the recovery of the CAS 413 segment closing adjustment, the government's approach is inconsistent with both the language and purpose of CAS 413.50(c)(12) and leads to potentially absurd results. As such, under the standard of review set forth in *Perry*, the government's view must fail. 47 F.3d at 1137. Instead, the court concludes that the portion of the surplus or deficit attributable to firm-fixed-price contracts must be identified in order to determine the recoverable portion of the segment closing adjustment.

### 4. The Pension Surplus Attributable to Flexibly–Priced Contracts Is Recoverable as a Current Period Adjustment at the Time of the Segment Closing

Teledyne contends that the phrase "previously-determined pension costs" means not only that the CAS 413 segment closing adjustment must be traced back to each prior contract to determine the amount of the pension surplus or deficit, but that CAS 413.50(c)(12) also requires a past period adjustment under each of those contracts. Based on this assumption, Teledyne argues that if the flexibly-priced contracts that gave rise to the surplus or deficit have been closed and final indirect cost rates have been set, recovery under those contracts is barred. The court rejects Teledyne's contention that the CAS 413 segment closing adjustment is a past period adjustment. Although CAS 413.50(c)(12) contemplates a look back to the past contracts to determine the recoverable amount of the adjustment, CAS 413.50(c)(12), by its terms, calls for an adjustment in the current period at the time of the segment closing.

The words of CAS 413 and established contract principles compel the court's conclusion. Although the CAS 413.50(c)(12) calculation represents an adjustment of "previously-determined pension costs," it is clear from the language of the provision that the triggering event is the segment closing, and that the adjustment representing the pension surplus or deficit is to be applied at that time.

there were no records. 48 C.F.R. § 9904.413–50(c)(12)(vi).

**31.** For these same reasons, the government's reliance on Accounting Principles Board ("APB") Opinion No. 8 in support of its argument in favor of basing the segment closing adjustment on the mix of contracts in the current period at the time of the segment closing is also misplaced. While it is true, as the government argues, that the CASB made reference to APB Opinion No. 8 in the preamble to the original CAS 413, the fact is that the CASB was referring to APB Opinion No. 8 in the context of justifying the use of a fifteen-year amortization period to account for annual actuarial gains and losses on an ongoing basis. As explained above, the CASB intended to distinguish the treatment of the segment closing adjustment from that of ordinary gains and losses.

Moreover, neither the CASB or this court is bound by general accounting principles in interpreting and applying CAS. APB Opinion No. 8 addresses recognizing gains and losses for third-party financial reporting purposes; it does not address determining the government's share of a pension surplus or deficit. As noted by the Federal Circuit, "... one must be cautious in using 'generally accepted accounting principles' as an aid in determining the allocability of costs to government contracts. Such principles have been developed for asset valuation and income measurement, and 'are not cost accounting principles' as such, although 'cost accounting concepts ... [may] evolve out of' them." *Grumman Aerospace Corp. v. United States*, 218 Ct.Cl. 441, 456 n. 15, 587 F.2d 498 (1978) (alterations in original) (citations omitted).

As noted above, CAS 413.50(c)(12) provides in pertinent part:

The calculation of the difference between the market value of the assets and the actuarial liability shall be made *as of the date of the event (e.g., contract termination) that caused the closing of a segment.* If such a date cannot be readily determined, or if its use can result in an inequitable calculation, the contracting parties shall agree on an appropriate date.

4 C.F.R. § 413.50(c)(12) (emphasis added). CAS 413.50(c)(12) then goes on to state that the calculation "represents an adjustment of previously-determined pension costs." *Id.* There is nothing in the language of CAS 413.50(c)(12) that requires the contractor to undertake a past period adjustment for each contract under which pension costs were paid. In fact, by using the word "represents," the CASB indicated that CAS 413.50(c)(12) does not call for an *actual* adjustment of those original pension costs. Rather, CAS 413.50(c)(12) requires a calculation that will identify a potential credit or cost to be paid at the segment's final contract closing with the government.

Because the court concludes that the CAS 413 segment closing adjustment allows for recovery in the current period at the time of the segment closing, the terms of the Allowable Cost and Payment and Credits clauses will govern. "As a general proposition, . . . cost principles are concerned with assuring that if the Government pays a cost and later that cost is reduced, by whatever means, the Government receives the benefit of that reduction." *NI Indus., Inc.,* 92–1 BCA ¶ 24,-631, at 122,914 (citing *RMK–BRJ, a Joint Venture,* ASBCA No. 16031, 74–1 BCA ¶ 10,-535, at 49,896 (Mar. 18, 1974)) (internal quotations omitted). Under the Allowable Cost and Payment clause, if the CAS 413 calculation shows a surplus, the contractor will be required "to pay to the Government any refunds, rebates, credits, or other amounts . . . accruing to or received by the Contractor . . . to the extent that they are properly allocable to costs for which the Contractor has been reimbursed by the Government." 48 C.F.R. § 52.216–7(h)(2). The provision is then implemented through the Credits clause, which states that, "The applicable portion of any income, rebate, allowance, or other credit relating to any allowable cost and received by or accruing to the contractor shall be credited to the Government either as a cost reduction or by cash refund." *Id.* § 31.201–5. In the case of a pension deficit identified as a result of the CAS 413 segment closing adjustment, the contractor will be able to claim the additional pension costs as allowable costs at the time of final contract close out. *Id.* § 52.216–7.

In view of the foregoing, the court rejects Teledyne's contention that the recovery is barred in this case because final indirect cost rates were set for the flexibly-priced contracts that gave rise to the TES pension surplus. Teledyne argues that under each of the flexibly-priced contracts that gave rise to the surplus in their case, FAR 42.701 bars recovery. FAR 42.701 states that once indirect cost rates have been finalized, i.e., have been "established and agreed upon by the Government and the contractor," the rates are *"not subject to change." Id.* § 42.701(b) (1998). Because Teledyne treated its pension costs as indirect costs, Teledyne argues that once those indirect cost rates were finalized, those cost rates, including pension costs, cannot be reopened.

Contrary to Teledyne's contentions, the court finds that FAR 42.701 does not apply. First, as noted above, because the government can recover the CAS 413.50(c)(12) adjustment under the Allowable Cost and Payment and Credits clauses under its open flexibly-priced contracts at the time of the segment closing, there is no need to revisit indirect cost rates. Second, even if Teledyne were correct and recovery under CAS 413.50(c)(12) had to be traced back and allocated to the individual contracts that gave rise to the surplus or deficit, Teledyne's construction of FAR 42.701 would still fail. As Teledyne concedes, the interplay between CAS 413.50(c)(12), the Allowable Cost and Payment clause, the Credits clause, and FAR 42.701 is an issue of contract construction and interpretation. The fundamental role of the court is to give each provision meaning. *Stratos Mobile Networks USA, LLC v. United States,* 213 F.3d 1375, 1381 (Fed.Cir.2000)

(quoting *Dalton,* 98 F.3d at 1305). Applying this guidance, the court would still allow for recovery because the parties can assign a portion of the recoverable adjustment amount to each flexibly-priced contract that gave rise to the recoverable portion of the segment closing adjustment. This interpretation gives meaning to the CAS 413 segment closing provision in those contracts without disturbing the indirect cost rates. In contrast, Teledyne's argument reads the CAS 413 segment closing provision out of Teledyne's contracts, and therefore fails.

Finally, as other courts and boards have recognized in similar circumstances, Teledyne should have understood when it entered into contracts containing CAS 413 that it would not be entitled to keep the pension surplus attributable to government contributions to the segment's pension plans paid under flexibly-priced contracts:

> It is undisputed that the 'pension plan assets' on which earnings were realized were, in the first instance, contributions to the plan for which [the contractor] had been reimbursed by the Government. To permit [the contractor] to keep earnings on such pension plan contributions would "result in the Government's furnishing [the contractor] with money which [the contractor] could reinvest solely for its own profit. This could hardly have been the intention of the contract[s]" under which [the contractor] received such reimbursements.

*NI Indus., Inc.,* 92–1 BCA ¶ 24,631, at 122,-914 (alteration in original) (quoting *ITT Fed. Support Svcs.,* 209 Ct.Cl. at 165, 531 F.2d 522 (1976)). To allow Teledyne to keep the surplus pension assets attributable to pension costs paid by the government would result in a windfall to Teledyne that would be contrary to the contractual intent of the parties.

For all of these reasons, the court finds that recovery of any pension plan surplus or deficit attributable to government contributions made under flexibly-priced contracts is recoverable in the current period at the time of the segment closing under the FAR Allowable Cost and Payment and Credits clauses.

### 5. The Government Is Entitled to Recover Only That Portion of the CAS 413 Segment Closing Adjustment That Is Attributable to Pension Contributions Made by the Government Under Flexibly–Priced Contracts That Included CAS 413

■ Finally, the court must address whether there are any other limitations on the recovery triggered by the CAS 413.50(c)(12) adjustment. First, Teledyne and GE argue that the government cannot recover any portion of the CAS 413.50(c)(12) adjustment that is attributable to contracts entered into prior to the 1978 effective date of the original CAS 413.50(c)(12). Second, GE asserts that the government cannot recover any portion of the CAS 413.50(c)(12) adjustment that is attributable to pension contributions made by employees.[32]

The court agrees with Teledyne and GE that the pension surplus or deficit attributable to contracts that predate the original CAS 413 must be excluded from the portion of the CAS 413 segment closing adjustment that is subject to recovery for several reasons. First, by its terms, CAS 413 mandates that it shall apply prospectively only. As stated in CAS 413.80(b), the "Standard shall be followed by each contractor on or after the start of his next cost accounting period beginning after the receipt of a contract to which this Cost Accounting Standard is applicable." 4 C.F.R. § 413.80(b). This is consistent with the CASB's statutory mandate, which states: "Cost-accounting standards ... shall take effect not earlier than the expiration of the first period of sixty calendar days of continuous session of the Congress following the date on which a copy of the proposed standards, rules, or regulations is transmitted to the Congress ...." Pub.L. No. 91–379, § 719(h)(3). Thus, neither the government nor the contractor can recover any surplus or deficit attributable to contracts that did not contain the original CAS 413. This includes contracts executed between the parties prior to the first applicable cost accounting period after March 10, 1978,

---

32. It is undisputed that there is no recovery of any pension surplus or deficit attributable to costs paid under non-CAS covered contracts or commercial contracts.

the effective date for CAS 413. 4 C.F.R. § 413.80(a)–(b).

Second, if the CAS 413 segment closing adjustment extended to pension contributions made under contracts that did not include CAS 413, it would amount to a government-mandated change in accounting practices, which would in turn require an equitable adjustment under subparagraph (a)(4)(i) of the CAS Clause, FAR 52.230–2(a)(4)(i). As discussed above, *see supra* Part VI.A.2.b, a government-mandated change in accounting practices is a change that results in increased or decreased costs that were not contemplated by the original contract. 48 C.F.R. § 52.230–2(a)(4)(i); *PACCAR, Inc.*, 89–2 BCA ¶ 21,696, at 109,079; *Ford Aerospace and Comm. Corp.*, 83–2 BCA ¶ 16,813, at 83,629. Because contractors would not have had to perform the CAS 413 calculation before its promulgation, a retroactive application of the CAS 413 segment closing adjustment to pre-CAS 413 contracts that affects contract costs would constitute a change in accounting practices and trigger the application of FAR 52.230–2(a)(4)(i). 48 C.F.R. § 52.230–2(a)(4)(i).

The court also agrees with GE's assertion that under the Allowable Costs and Payment and Credits clauses, the government is only entitled to recover the amounts attributable to government contributions to the segment's pension plan. *See id.* §§ 52.216–7(h), 31.201–5. Nothing in CAS 413.50(c)(12) suggests that the government is entitled to recover the amounts attributable to pension contributions made by employees.

The principal purpose of the Allowable Cost and Payment and Credits clauses is to provide the government with a refund when a cost that it has reimbursed to a contractor is later reduced. *Id.* §§ 52.216–7(h), 31.201–5. A "[cost plus a fixed fee contract] makes the Government liable only for such costs as

the contractor incurs and any reduction of a cost after reimbursement entitles the Government to a refund." *Grumman*, 218 Ct.Cl. at 454, 587 F.2d 498 (alteration in original) (quoting *Northrop Aircraft Inc. v. United States*, 127 F.Supp. 597, 599, 130 Ct.Cl. 626, 630 (1955)). However, it is well settled that the Allowable Cost and Payment and Credits clauses only entitle the government to a credit or refund of costs that the government actually reimbursed. "It is not every refund which a contractor may receive to which the Government is entitled. Before any entitlement arises, the Government must have paid the costs to which the refund is applicable." *RMK–BRJ*, 74–1 BCA ¶ 10,535, at 49,895. *See also NI Indus., Inc.*, 92–1 BCA ¶ 24,631, at 122,913; *Cal. Inst. of Technology*, NAS-ABCA No. 467–14, 69–2 BCA ¶ 7892, at 36,-717 (Sept. 5, 1969) (holding that portion of insurance premium payments paid by employees is "not allocable to costs which have been reimbursed by the government and the Government is not entitled to that portion of the refunds").

The decision in *ITT Federal Support Services*, which concludes that the government is entitled to recover the surplus attributable to employee contributions is inapposite. 209 Ct.Cl. at 165, 531 F.2d 522. The court's decision in *ITT Federal Support Services* is based on specific contract provisions at issue in that case, which expressly gave the government ownership of the surplus funds there. *Id.* As set forth above, there is no express contract provision that provides the government with a right to recover the pension surplus attributable to employee contributions here. Thus, any pension surplus arising from pension plan contributions made by employees or others besides the government would not be recoverable by the government under the Allowable Cost and Payment and Credits clauses.[33]

**33.** In this connection, the Supreme Court has held that surplus pension plan assets attributable to employee contributions to a defined benefit plan belong to the pension plan, and thus the employees are not entitled to a share of a pension plan surplus based on their contributions. *Hughes Aircraft Co., et al. v. Jacobson*, 525 U.S. 432, 440–441, 119 S.Ct. 755, 142 L.Ed.2d 881 (1999). In *Hughes*, the Supreme Court explained the nature of the employees' interest in

the plan as limited to the defined pension benefit offered by the plan:

The structure of a defined benefit plan reflects the risk borne by the employer. Given the employer's obligation to make up any shortfall, no plan member has a claim to any particular asset that composes a part of the plan's general asset pool. Instead, members have a right to a certain defined level of benefits, known as 'ac-

In sum, the government is only entitled to recover the portion of the CAS 413.50(c)(12) adjustment that is attributable to costs that the government paid. The court now turns to the TVS sale.

## B. THE TVS SALE

### 1. The TVS Sale Is a Segment Closing Under the Amended CAS 413

There is no dispute that the TVS sale, which occurred after the 1995 CAS 413 became effective, is a segment closing as provided in CAS 413.30(a)(20). The amended CAS 413.30(a)(20) provides in relevant part: "*Segment closing* means that a segment has (i) been sold or ownership has been otherwise transferred...." 48 C.F.R. § 9904.413–30(a)(20). While Teledyne does not dispute that the TVS sale is a segment closing, it strongly disputes the government's position that the 1995 CAS 413 segment closing provision should be applied to the TVS sale.

Teledyne challenges the 1995 CAS 413 segment closing provision on both substantive and procedural grounds. Teledyne argues that the 1995 CAS 413 is substantively invalid on the grounds that it is impermissibly retroactive and goes beyond the CASB's authority because it affects pension costs paid under firm-fixed-price contracts. Teledyne also argues that the 1995 CAS 413 segment closing provision is invalid on several procedural grounds. Teledyne argues that the CASB violated the notice and comment procedures under the Office of Federal Procurement Policy Act of 1988 ("OFPPA"), 41 U.S.C. § 422, and a number of other statutory and regulatory requirements when it promulgated the amended CAS 413.50(c)(12).

In the alternative, Teledyne contends that if the new CAS 413.50(c)(12) is valid, applying the new Standard to pension surpluses attributable to contracts entered into under the original CAS 413 segment closing provision amounts to a government-mandated ac-

counting change under the equitable adjustment provision of the CAS clause, FAR 52.230–2(a)(4)(i). *Id.* § 52.230–2(a)(4)(i). Teledyne argues that under FAR 52.230–2(a)(4)(i), it is entitled to an equitable adjustment for any amount over and above the amount for which Teledyne was liable to the government under the original CAS 413.50(c)(12). The court will address each of these arguments in turn.

### 2. The Amended CAS 413 Is Not Impermissibly Retroactive

■ Teledyne argues at great length that the amended CAS 413 segment closing provision is invalid on the grounds that it is impermissibly retroactive. In support of its argument, Teledyne relies on the Supreme Court's decision in *Landgraf v. USI Film Products,* which held that a regulation is impermissibly retroactive where the agency lacks explicit Congressional authority to promulgate retroactive regulations. 511 U.S. 244, 270–72, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994). Here, Teledyne argues, the CASB did not have the authority to make the new CAS 413.50(c)(12) applicable to pension surpluses or deficits arising from earlier government contracts. According to Teledyne, the OFPPA, the CASB's authorizing legislation, expressly prohibits the CASB from promulgating regulations that affect the parties' obligations under prior contracts. 41 U.S.C. § 422. Teledyne notes that under the OFPPA, cost accounting standards "shall become effective within 120 days after publication in the Federal Register in final form, unless the Board determines a longer period is necessary." *Id.* § 422(g)(2). Based on this language, Teledyne asserts that the CASB lacks Congressional authority to enact cost accounting standards with retroactive effect. Teledyne contends that without explicit Congressional authority, the application of the 1995 CAS 413.50(c)(12) to pension gains or losses attributable to costs paid by the gov-

---

crued benefits.' ... plan members generally have a nonforfeitable right *only to their 'accrued benefit,'* so that a plan's actual investment experience does not affect their statutory entitlement. Since a decline in the value of a plan's assets does not alter accrued benefits,

*members similarly have no entitlement to share in a plan's surplus—even if it is partially attributable to the investment growth of their contributions.*

*Id.* (emphasis added).

ernment under contracts entered before the standard's effective date is impermissible.

Contrary to Teledyne's contentions, the court finds that the 1995 CAS 413 segment closing provision is not impermissibly retroactive. As the government correctly argues, under Teledyne's contracts with the government Teledyne agreed to comply with the amended CAS 413 segment closing provision. In particular, under subparagraph (a)(3) of the CAS clause, FAR 52.230–2, contractors must agree to:

> Comply with all CAS, including any modifications and interpretations indicated thereto contained in 48 C.F.R. Part 9904, in effect on the date of award of this contract .... *The Contractor shall also comply with any CAS (or modifications to CAS) which hereafter become applicable to a contract or subcontract of the Contractor. Such compliance shall be required prospectively from the date of applicability to such contract or subcontract.*

48 C.F.R. § 52.230–2(a)(3) (emphasis added). Thus, by entering into CAS-covered government contracts that contained the amended CAS 413.50(c)(12), Teledyne agreed to comply with the segment closing adjustment in place at the time of a segment closing.

In fact, Teledyne, through TVS, entered into government contracts on June 2, 1995, and August 3, 1995, that were subject to the amended CAS 413.50(c)(12). In such circumstances, the court agrees with the government that applying the new CAS 413 segment closing provision to the TVS sale does not constitute a retroactive application of CAS 413. *See Godoy v. Office of Pers. Mgmt.*, 221 F.3d 1329, 1331 (Fed.Cir.2000). In *Godoy*, the Circuit held that whether an enactment is retroactive "depends on whether the conduct that allegedly triggers the statute's application occurs before or after the law's effective date." *Id.* (citation omitted). Because Teledyne entered into contracts that contained the amended CAS 413.50(c)(12) and subsequently sold the TVS segment in 1996, after the effective date of the new CAS 413, March 30, 1995, the application of the new CAS 413 segment closing provision is not retroactive and therefore is permissible.

■ While the court concludes that the 1995 CAS 413.50(c)(12) is not impermissibly retroactive, that decision is tied to the court's further conclusion that the new 1995 CAS 413.50(c)(12) amounts to a government-imposed change in accounting practices, which triggers the application of subparagraph (a)(4)(i) of FAR 52.230–2. *See* 48 C.F.R. § 52.230–2(a)(4)(i). In particular, subparagraph (a)(4)(i) of FAR 52.230–2 provides that a contractor is entitled to "an equitable adjustment as provided in the Changes clause of this contract if the contract cost is affected by a change which, pursuant to subparagraph (a)(3) of this clause, the Contractor is required to make to the Contractor's established cost accounting practices." *Id.* Subparagraph (a)(3) of FAR 52.230–2(a) requires contractors to "comply with any CAS (or modifications to CAS) which hereafter become applicable to a contract or subcontract of the Contractor." *Id.* § 52.230–2(a)(3). When read together, subparagraph (a)(3) and (a)(4)(i) of FAR 52.230–2 entitle Teledyne to an equitable adjustment in the amount of the pension surplus for which Teledyne is liable under the amended 1995 CAS 413.50(c)(12) that is over and above the amount for which Teledyne would have been liable under the original CAS 413.50(c)(12). *Id.* §§ 52.230–2(a)(3), 52.230–2(a)(4)(i).

The court discusses the criteria for establishing a government-mandated accounting change at length with respect to GM's contention that the original CAS 413.50(c)(12) is a change in accounting practice, *see supra* Part VI.A.2.b. In general, the equitable adjustment provision of the CAS clause, FAR 52.230–2(a)(4)(i), is triggered "whenever the application of a *new* standard result[s] in a change in accounting practice and an associated change in contract cost." *PACCAR, Inc.*, 89–2 BCA ¶ 21,696, at 109,076 (emphasis added). As noted at the outset, the TVS pension plans were fully funded and the government ceased making pension contributions as of 1986. Thus, the government made no pension contributions to Teledyne under the post–1995 contracts. As such, the entire portion of the pension surplus attributable to CAS-covered contracts arose under contracts that included only the original CAS

413.50(c)(12). The 1995 CAS 413 segment closing provision changes the accounting practices that were part of the pre–1995 contracts by making the contractor liable for the pension surplus attributable to firm-fixed-price contracts, for which it was not previously liable under those contracts. It is this change from the original CAS 413.50(c)(12) to the 1995 CAS 413.50(c)(12) that triggers FAR 52.230–2(a)(4)(i). *Id.;* 48 C.F.R. § 52.230–2(a)(4)(i).

Notably, the government fails to contradict Teledyne's argument that the application of the 1995 CAS 413 segment closing provision is a mandatory change in accounting practice under FAR 52.230–2(a)(4)(i) that entitles Teledyne to an equitable adjustment under the Changes clause of the contract. Nowhere in the government's papers filed in this case has the government responded to Teledyne's contention that application of the new CAS 413.50(c)(12) to contracts entered prior to its enactment gives rise to the right to an equitable adjustment under the CAS clause. Indeed, the government concedes that the 1995 CAS 413.50(c)(12) is a departure from the requirements under the original CAS 413.50(c)(12). As noted above, the government acknowledges that there is no recovery of the portion of a segment closing adjustment attributable to firm-fixed-price contracts under the original CAS 413.50(c)(12). In its motion for partial summary judgment, the government states: "Upon further review and in light of the extensive consideration within the Government previously referred to, defendant does not contend that the 1995 Amendments to CAS 413 made no changes in the pre–1995 CAS 413 that went beyond clarification and confirmation of the prior CAS interpretation." Def.'s Cross Mot. Partial Summ. J. and Opp. to Teledyne's Mot. Partial Summ. J., at 30 (Nov. 3, 1999). Moreover, in its opposition to GM's argument that the original CAS 413.50(c)(12) is a change in accounting practice, the government acknowledged that the purpose of subparagraph (a)(4)(i) of the CAS clause was to protect against the fundamental unfairness that could result if a contractor was required to absorb the cost of a government-mandated change in accounting practice that changed the pre-existing bargain that the parties made in their contract. Def.'s Reply Br. Resp. Ct.'s Order Dated May 25, 2000, at 33 (Oct. 10, 2000).

In view of the foregoing, the government's assumption that Teledyne's voluntary agreement to enter into contracts with the government after the effective date of the 1995 CAS 413 carries with it Teledyne's agreement to pay the government the pension surplus attributable to firm-fixed-price contracts entered both before and after its enactment is without merit. If not for the equitable adjustment provision of the CAS clause, FAR 52.230–2(a)(4)(i), the additional payment obligations imposed on Teledyne under the 1995 CAS 413 segment closing provision might indeed have the effect of a retroactive price increase on Teledyne's firm-fixed-price contracts entered into prior to the effective date of the 1995 CAS 413. In such circumstances, the new CAS 413 segment closing provision might result in a breach of the government's obligations under its firm-fixed-price contracts. *See United States v. Winstar,* 518 U.S. 839, 870, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996) (holding that change in law governing capital requirements for thrift industry was breach of government's contractual promise to treat capital requirements in a certain manner). Recognizing the right of the government to transition from one particular accounting practice to another, the equitable adjustment provision of the CAS clause provides a mechanism by which the impact of the change can be alleviated, while still allowing the change in accounting practice to be implemented. That mechanism clearly applies here.

### 3. The New CAS 413 Does Not Exceed the CASB's Statutory Authority

Teledyne contends that even if the amended CAS 413.50(c)(12) is not invalid on retroactivity grounds, it is still substantively defective and therefore must be invalidated. In particular, Teledyne argues that under the OFPPA, 41 U.S.C. § 422(h), the CASB does not have the authority to require price adjustments under firm-fixed-price contracts, except in circumstances not relevant here. According to Teledyne, allowing for price

adjustments is a matter for the procuring agencies, not the CASB.

The government argues that under the standard established by the Federal Circuit in *Boeing Co. v. United States*, a cost accounting standard must be affirmed unless it "clearly contradicts" the CASB's enabling legislation. 230 Ct.Cl. 663, 673–74, 680 F.2d 132 (1982) ("Where there is a 'broad congressional grant of administrative authority to prescribe rules and regulations to effectuate the provisions of the Act . . . our scope of review is limited . . . [t]his court . . . can invalidate such a regulation only if it clearly contradicts the terms or purposes of the statutes.' ") (alterations in original) (citations omitted). The government further argues that under the OFPPA, Congress gave the CASB authority to enact regulations "designed to achieve uniformity and consistency in the cost accounting standards governing *measurement, assignment, and allocation of costs to contracts with the United States.*" 41 U.S.C. § 422(f) (emphasis added). The government contends that consistent with this authority, the amended CAS 413.50(c)(12) provides for: (1) the measurement of pension costs through the adjustment of previously-determined pension costs; (2) the assignment of the pension cost adjustment to the current period; and (3) the allocation of the government's share of the pension cost to both firm-fixed-price and flexibly-priced contracts. As such, the government concludes that the 1995 CAS 413.50(c)(12) does not "clearly contradict" the CASB's legislative mandate.

The court agrees with the government that the amended CAS 413.50(c)(12) does not clearly contradict the OFPPA, and therefore satisfies the standard set forth in *Boeing Company*, 230 Ct.Cl. at 673–74, 680 F.2d 132. Clearly, the amended CAS 413.50(c)(12) provides for the measurement, assignment, and allocation of costs, as required under 41 U.S.C. § 422(f). To the extent there is any question about the CASB's authority to provide for price adjustments to firm-fixed-price contracts, that issue is moot in light of the

amendments to the pension termination provision, FAR 31.205–6(j)(4). 48 C.F.R. § 31.205–6(j)(4) (1998). As noted with the proposal to amend FAR 31.205–6(j)(4), quoted *supra* Part VI.A.2.b, the provision was amended to incorporate the new CAS 413 segment closing provision, and plainly confirms the government's or contractor's right, in the circumstances identified, to a price adjustment following a segment closing.[34] 62 Fed.Reg. at 49,900.

### 4. The CASB Complied with All Necessary Procedural Requirements in Promulgating the Amended CAS 413 Segment Closing Provision

■ Teledyne further argues that the CASB violated the procedural dictates of the OFPPA by failing to follow the proper notice and comment procedures on the proposed CAS 413.50(c)(12). Teledyne notes that although the CASB is exempt from the notice and comment requirements of the Administrative Procedures Act, 5 U.S.C. § 701–706 (1994), the OFPPA sets forth specific procedural requirements that the CASB must follow when promulgating new regulations, 41 U.S.C. §§ 422(g)(3), 422(g)(1). Teledyne argues that the CASB failed to provide appropriate notice of its intention to allow for price adjustments when it sought comments on the proposed amended CAS 413.50(c)(12). Teledyne also cites 41 U.S.C. § 418b (1994 & Supp. V 1999), which sets forth procedural requirements for "[federal] procurement policy, regulations, procedures and forms," as implemented by the FAR rulemaking procedures, contained in FAR 1.105–1, 48 C.F.R. § 1.105–1 (1995). Teledyne contends that the procedural requirements under these provisions are consistent with that of the OFPPA, and thus to the extent the CASB violated the procedural mandate of the OFPPA, it also failed to comply with 41 U.S.C. § 418b and FAR 1.105–1.

In addition, Teledyne charges that the CASB failed to comply with the Paperwork Reduction Act, Executive Order 12,866, and the Regulatory Flexibility Act. Teledyne con-

---

**34.** Because the court concludes that Teledyne is not liable for a price adjustment here, it is not necessary to determine whether the price adjust-

ment required by the 1995 CAS 413.50(c)(12) was enforceable before FAR 31.205–6(j)(4) was amended.

tends that the CASB violated the Paperwork Reduction Act, 44 U.S.C. §§ 3501–3520, because the CASB failed to obtain OMB approval for the paperwork burden on offerors and contractors arising from the 1995 CAS 413 segment closing provision. Teledyne contends that the requirement in CAS 413.50(c)(12)(vi) that contractors determine the amount of government contributions made "during a period of years representative of the Government's participation in the pension plan" constitutes the "collection of information" that would trigger the approval requirement of the Paperwork Reduction Act. *Id.* § 3502(3).

Teledyne further argues that the amended CAS 413.50(c)(12) violates Executive Order 12,866 because the CASB failed to conduct the economic impact study required under that Order. Executive Order 12,866 requires an agency to conduct a regulatory cost impact study before issuing any regulation expected to have an annual effect on the nation's economy of at least $100 million. Exec. Order No. 12,866, § 6(b) (Sept. 30, 1993), *reprinted in* 1993 U.S.C.C.A.N. B82, B88. Teledyne recognizes that a violation of Executive Order 12,866 in and of itself is insufficient to render a rulemaking unenforceable, *Trawler Diane Marie, Inc. v. Brown*, 918 F.Supp. 921, 932 (E.D.N.C.1995), *aff'd mem.*, 91 F.3d 134 (4th Cir.1996), but maintains that the CASB's disregard for its requirements is further support that the CASB was acting beyond its authority.

Finally, Teledyne challenges the CASB's failure to conduct a regulatory flexibility analysis under the Regulatory Flexibility Act. 5 U.S.C. § 553 (1994). Teledyne concedes that the CASB is expressly exempt from 5 U.S.C. § 553, but contends the Act applies because it provides that a regulatory flexibility analysis is required whenever an agency is required by 5 U.S.C. § 553 *"or any other law*, to publish general notice of proposed rulemaking for any proposed rule." *Id.* § 603(a) (1994 & Supp. V 1999) (emphasis added).

The government refutes all of Teledyne's arguments. First, the government notes that the OFPPA, 41 U.S.C. § 422(g), expressly exempts CASB regulations from re-

view under the Administrative Procedures Act, 5 U.S.C. § 701–706 (1994). The government further contends that the CASB fully complied with all of the procedural requirements set forth in the OFPPA, 41 U.S.C. § 422(g). In particular, the government asserts that the CASB gave adequate notice of the inclusion of firm-fixed-price contracts in the new CAS 413 segment closing adjustment provision. The government argues that although the proposed CAS 413.50(c)(12) did not explicitly refer to firm-fixed-price contracts, the proposed illustrations in CAS 413.60(c)(8) and (c)(9) made clear that the CASB intended to include fixed-price contracts within the ambit of the new segment closing adjustment being proposed. 58 Fed. Reg. 59,006, § 9904.413–00(c)(8)–(c)(9) (Illustrations).

Additionally, the government notes that the CASB received comments from industry and other interested parties that specifically addressed the inclusion of firm-fixed-price contracts within the proposed CAS 413 amendments. Thus, the government argues that the express reference to fixed-price contracts in the final promulgated version of the 1995 CAS 413.50(c)(12) is a "logical outgrowth" of the notice and comment on the proposed rule, and therefore the CASB was not required to provide additional notice and comment. *See Appalachian Power Co. v. EPA*, 135 F.3d 791, 804 n. 22 (D.C.Cir.1998) (citations omitted); *American Paper Inst. v. EPA*, 660 F.2d 954, 959 n. 13 (4th Cir.1981) (citation omitted). For these reasons, the government argues that the 1995 CAS 413.50(c)(12) is valid and should be applied to Teledyne's sale of TVS.

The government also counters each of Teledyne's additional procedural challenges. At the outset, the government notes that in the preamble to the final rule, the CASB addressed the regulatory requirements cited by Teledyne. 60 Fed.Reg. at 16,536. With respect to the Paperwork Reduction Act, the CASB stated that the Act "does not apply to this final rule, because this rule imposes no paperwork burden on offerors, affected contractors and subcontractors, or members of the public which requires the approval of OMB under 44 U.S.C. 3501, *et seq.*" *Id.* As

to the Regulatory Flexibility Act, the CASB stated that "this final rule does not have a significant effect on a substantial number of small entities because small businesses are exempt from the application of the Cost Accounting Standards." *Id.*

Further, the government argues that none of the regulatory mandates cited by Teledyne give rise to a private right of action by which Teledyne can invalidate CAS 413.50(c)(12). For example, the government argues that the Paperwork Reduction Act serves only as a defense against the imposition of a penalty by the government for a contractor's failure to maintain or provide information required by the government, and does not provide a private right of action. In addition, with respect to the Regulatory Flexibility Act, the government contends that compliance with the requirements of that act was not subject to judicial review at the time the CASB promulgated the 1995 CAS 413. In any event, the government argues, Teledyne does not qualify as a small entity that can seek relief under the amendments to the Regulatory Flexibility Act. Finally, with respect to Executive Order 12,866, the government argues that Teledyne's claim under that Order is simply not subject to judicial review under the plain terms of the Order. Exec. Order No. 12,866, § 10, *reprinted in* 1993 U.S.C.C.A.N. at B92.

The court agrees with the government in all respects. The CASB did not violate the procedural dictates of the OFPPA, or 41 U.S.C. § 418b and FAR 1.105–1, in promulgating the 1995 CAS 413. The administrative record relating to the 1995 CAS 413 reflects that the CASB went through each stage of notice and comment required by the OFPPA. 41 U.S.C. § 422(g). The CASB issued the required advanced notice of proposed rulemaking, *see* 58 Fed.Reg. 6103–04, and notice of proposed rulemaking, 58 Fed. Reg. 58,999–59,006, soliciting comments from industry, government agencies, and other interested parties. In the notice of proposed rulemaking and in the final rule, the CASB addressed those comments in detail. *Id.* at 59,000–003; 60 Fed.Reg. 15,536–40. The OFPPA did not require the CASB to do more. In this connection, the court also

finds that the CASB's compliance with the OFPPA also satisfied its obligations, if any, under the FAR notice and comment requirements, under 41 U.S.C. § 418b and FAR 1.105–1. As Teledyne itself acknowledged, the requirements under the FAR notice and comment procedures are consistent with those required by the OFPPA. *Compare* 41 U.S.C. § 418b and FAR 1.105–1, with 41 U.S.C. § 422(g).

In addition, the court concludes that the draft versions of the 1995 CAS 413.50(c)(12), issued as part of the CASB's notice and comment procedures, gave adequate notice of the changes being considered as part of the new segment closing adjustment provision, CAS 413.50(c)(12). In particular, the court agrees with the government that the illustrations in the proposed rule were sufficiently clear so as to put the inclusion of firm-fixed-price contracts in the credit provision out for comment. *See* 58 Fed.Reg. 59,006, § 9904.413–00(c)(8)–(c)(9) (Illustrations). Indeed, as quoted *supra* Part VI.A.2.b and note 24, the administrative record reflects that several commentators noticed the change and submitted lengthy comments regarding the inclusion of firm-fixed-price contracts, and the CASB responded to these comments in the final rule. 60 Fed.Reg. at 16,539–40. Accordingly, the court finds no grounds upon which to set aside the 1995 CAS 413.50(c)(12).

 Finally, the court finds no merit to Teledyne's additional procedural claims. None of the provisions cited by Teledyne provide any basis upon which to invalidate the 1995 CAS 413.50(c)(12). The Paperwork Reduction Act "does not authorize a private right of action." *Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 844 (9th Cir.1999). Likewise, Executive Order 12,866, by its plain terms, precludes judicial review of an agency's compliance with its directive. Exec. Order No. 12,866, § 10, *reprinted in* 1993 U.S.C.C.A.N. at B92. Accordingly, Teledyne cannot use these provisions as a basis to challenge the 1995 CAS 413 segment closing provision.

In addition, although the Regulatory Flexibility Act permits some limited judicial review, it fails to provide a right of review in

the present circumstances. The judicial review provision of the Regulatory Flexibility Act, 5 U.S.C. § 611, expressly states that "a small entity that is adversely affected or aggrieved by final agency action is entitled to judicial review of agency compliance with the requirements" of the Act. Teledyne clearly fails to meet the definition of a "small entity," as defined in the Act, 5 U.S.C. § 601, and therefore cannot rely on the Act to defeat the 1995 CAS 413.

Because Teledyne has failed to assert any basis upon which the court should invalidate the regulation, the court concludes that the 1995 CAS 413.50(c)(12) is valid and enforceable.

## VII. CONCLUSION

In summary, for the reasons set forth above, the court concludes as follows:

(1) Teledyne's sale of the TES segment is a "segment closing" subject to the terms of the original CAS 413.50(c)(12).

(2) Upon a segment closing, the original CAS 413.50(c)(12) requires a *calculation* of the difference between the actuarial liability for the segment and the market value of the assets allocated to that segment that is attributable to all CAS-covered contracts, including both firm-fixed-price contracts and flexibly-priced contracts. The resulting amount *represents an adjustment of previously-determined pension costs.*

(3) Whether any allocable portion of the CAS 413.50(c)(12) adjustment is recoverable depends on the contract terms under which the pension costs were paid. Absent a specific contract provision, the surplus or deficit attributable to government contributions under firm-fixed-price contracts is not recoverable. A contractor is not entitled to an equitable adjustment under the CAS clause, FAR 52.230–2(a)(4)(i), because the original CAS 413 segment closing provision is not a change in accounting practices with respect to contracts containing the original CAS 413.50(c)(12).

(4) The portion of the surplus or deficit attributable to flexibly-priced contracts under which pension costs were reimbursed by the government is recoverable under the Allowable Cost and Payment clause, FAR 52.216–7(h), and the Credits clause, FAR 31.201–5. The amount of the CAS 413 segment closing adjustment that is recoverable equals the proportion of the surplus that is attributable to government contributions under flexibly-priced contracts containing CAS 413.50(c)(12). The government is not entitled to a credit of any pension surplus that is not attributable to pension costs reimbursed by the government or paid under contracts that pre-date CAS 413.50(c)(12). The recoverable amount is recoverable as a current period adjustment at the time of the segment closing.

(5) Teledyne's sale of the TVS segment is a "segment closing" under the terms of the 1995 CAS 413.50(c)(12), and is governed by the terms of the 1995 CAS 413.50(c)(12). Under the 1995 CAS 413 segment closing provision, Teledyne is liable to the government for the amount of the pension surplus that is attributable to government pension contributions paid under both firm-fixed-price and flexibly-priced contracts, as calculated under that provision.

(6) The 1995 CAS 413.50(c)(12) is not impermissibly retroactive, in excess of the CASB's authority, or procedurally defective. Therefore, it is valid and enforceable.

(7) Applying the CAS 413 segment closing provision to the TVS sale amounts to a change in accounting practice that triggers FAR 52.230–2(a)(4)(i), because the entire portion of the TVS pension surplus that is attributable to CAS-covered contracts arose under contracts that contain only the original CAS 413 segment closing provision. In such circumstances, Teledyne is entitled to an equitable adjustment under FAR 52.230–2(a)(4)(i) in the amount of the pension surplus for which Teledyne is liable to the government under the

amended 1995 CAS 413.50(c)(12) that is over and above the amount for which Teledyne would have been liable under the original CAS 413.50(c)(12).

Accordingly, the court **GRANTS IN PART** and **DENIES IN PART** defendant's cross motion for partial summary judgment. The court also **GRANTS IN PART** and **DENIES IN PART** plaintiffs' motion for partial summary judgment. Each party to bear its own costs.

Pursuant to 28 U.S.C. § 1292(d)(2) (1994), the court certifies that the interpretation of both the original and the amended CAS 413.50(c)(12) presents a controlling question of law with respect to which there is a substantial ground for difference of opinion, and that an immediate appeal from this order with regard to that question may materially advance the ultimate termination of this litigation. All proceedings in this matter are stayed until further order of the court.